James D. ALLRED, Petitioner,

v.

STATE of Alaska, Respondent.

No. 2343.

Supreme Court of Alaska.

Aug. 12, 1976.

Phillip P. Weidner, Herbert D. Soll, Anchorage and Civil Rights-Civil Liberties Research Committee, Harvard Law School, for petitioner.

Stephen G. Dunning, Asst. Dist. Atty., and Joseph D. Balfe, Dist. Atty., Anchorage and Avrum M. Gross, Atty. Gen., Juneau, for respondent.

Before BOOCHEVER, C. J., RABINOWITZ, CONNOR and ERWIN, JJ., and DIMOND, J. Pro Tem.

## OPINION

CONNOR, Justice.

This case requires us to determine whether, and to what extent, a psychotherapist evidentiary privilege exists in Alaska.

On February 20, 1974, Paul D. O'Keefe was found dead in a hotel room in Anchorage. The room was rented to James D. Allred. Subsequently he was located by the Anchorage police at the Langdon Psychiatric Clinic, and was taken to police facilities for further questioning.

It is claimed that following detailed questioning by Investigator Ronald J. Rice, Allred made incriminating statements concerning the death of O'Keefe. There was no tape-recorded statement of this confession, however.

Allred asked to see Dr. Aron Wolf, a psychiatrist, or Shirley Henderson, who was a drug program coordinator and a counselor to petitioner. Henderson was summoned to the police station, and petitioner talked with her extensively. Thereafter Allred was indicted for first degree murder in connection with O'Keefe's death.

Once legal proceedings against petitioner commenced, he moved to suppress any testimony by Henderson concerning the conversation at the police station, on the theory that these communications were privileged. Judge Kalamarides heard and denied this suppression motion. At trial the state called Mrs. Henderson to testify. Following extensive argument Judge Edmond Burke ruled that she should testify to her conversation with Allred during their encounter at the police station. Henderson testified that:

"He [Allred] told me that he and Paul [O'Keefe] went to the Kobuk, that they had some wine and had been drinking some wine prior to that time, and that they had some valiums between the two of them and that they split them up and that they had been together most of that day and were discussing a suicide pact and that that discussion continued there in the Kobuk. I don't recall whether or not a decision was made at that time— who would do what first. But Del [Allred] did recall and told me that he had blacked out or passed out and was awakened by Paul, who was crying and begging him and saying, if you are my friend you will kill me—please, and he —with tears in his eyes—ahh—and begging Del. Dell told me that he had a gun and that he did shoot Paul, and that Paul laid on the floor and was jerking and moving and that he hit him with the gun but that he still didn't stop moving, and that this was his friend and he was

doing this for his friend because they were such good friends, and that he picked Paul up and put him in the bath tub and turned the water on until Paul stopped moving. After that he went into the bedroom—the adjoining room there— and he laid down with a gun at his own head, with his hand (sic) on the trigger, and he tried several times and could not pull the trig—trigger. He told me that he did not have the guts to do it, and that he just laid there. He didn't—he didn't remember whether he slept or— but that he laid there until the phone rang, which was the motel people calling him at 7:00, as he had pre-arranged for them to wake him up. He ca—I don't remember whether Del called a cab or whether the motel people called a cab, but that he got a cab and he came out to our office after that."

The defense apparently was able to introduce evidence tending to show that O'Keefe had committed suicide. In any event, the jury was unable to reach a verdict, a mistrial resulted, and a new trial is contemplated. We have granted review to determine whether any psychotherapist-patient evidentiary privilege would prevent Mrs. Henderson at retrial from testifying to her conversation with the defendant at the police station.

## I.

The word "privilege" is a corruption of the Latin phrase "privata lex", meaning a private law applicable to a small group of persons as their special prerogative. Slovenko, *Psychiatry and a Second Look at the Medical Privilege,* 6 Wayne L.Rev. 175, 181 (1960). The English doctrine of privilege is nearly as old as common law compulsory testimony. Privilege was originally conceived of in England as a judicially recognized point of honor among lawyers[1]

1. *Berd v. Lovelace,* Cary 88, 21 Eng.Rep. 33 (Ch. 1577); *but see* note 4. The modern use of witness testimony before the jury did not become common until the early 1500's, and compulsory testimony was not "generally authorized" at common law (as opposed to chancery proceedings) until the middle of Elizabeth's reign. Statute of Elizabeth, 5 Eliz. 1, c. 9, § 12 (1562–63). The medieval rule of non-compulsory testimony resulted in part from the traditions of ancient Germanic law, and in part from an aversion to "maintenance", i. e., friends of interested parties attempting to influence a jury. *See generally*

and other gentlemen[2] not to reveal confidential communications. This general rule of honor was conclusively repudiated in 1776,[3] although lawyers were able to maintain a privilege for their profession.[4]

8 J. Wigmore, Evidence § 2190 at 63–65, § 2290 at 542–43 (McNaughton rev. ed. 1961). Jury duty was, however, compulsory.

2. *See generally* 8 J. Wigmore, Evidence § 2286 at 530–31 (McNaughton rev. ed. 1961).

3. Duchess of Kingston's Case, 20 How.St.Tr. 355, 2 Smith L.C. 754 (12th ed.), 1 East, P.C. 468, 1 Leach 146, [1775–1802] All E. R. Reprint 623, 625–26 (H.L.1776). Lord Mansfield there held that there was no privilege for a physician; the Duchess was found guilty of bigamy, but the case was dismissed on a plea of benefit of clergy. *See generally* 8 J. Wigmore, Evidence § 2286, at 531 (McNaughton rev. ed. 1961).

4. One explanation has been advanced as to why lawyers maintained their privilege while other gentlemen lost theirs in the 18th century onslaught against "honor" as a basis for withholding testimony. The lawyers, it seems, characterized themselves as mere servants who should be required to keep their masters' confidences. Thus the privilege was transferred from lawyers to their clients.

This may stem from Roman law. As early as 123 B.C. the Acilian law of bribery made lawyers incompetent to testify against their clients. Cicero deplored his inability to call an opposing lawyer in a corruption case. By the 4th century A.D. "advocates and attorneys (agents) were made completely incompetent as witnesses in the case in which they acted." M. Radin, *The Privilege of Confidential Communication Between Lawyer and Client*, 16 Calif.L.Rev. 487, 488 (1928). This rule of evidence rested on the duty of fidelity (*fides*) owed alike by a servant (slave) and a family member to the family group. Specifically it was thought that the attorney's testimony was useless, whether in favor (because loyalty provides a motive for misstatement) or against (because violation of the *fides* proved the witness' disreputability) the client. *Id.* at 488–89. Radin admits he cannot show that English practice was influenced by the Roman rule. *Id.* at 489. But he notes that the "honor" theory of privilege is not a completely satisfactory explanation even for Elizabethan practice. While barristers were gentlemen, *Berd v. Lovelace, supra*, note 1, involved a solicitor; solicitors were merely middle class "men of business", and yet they acquired the privilege. Hence there may have been notions of loyalty as well as honor as a basis for English practice. *Id.* at 487. It is noteworthy that, in the Tudor

The common law did not recognize a physician-patient privilege.[5] Alaska Civil Rule 43(h)(4) provides:

"A physician or surgeon shall not, against the objection of his patient, be

period, modern servile implications of loyalty to a master would not necessarily be relied upon because the chivalric feudal duty of loyalty was still known and respected.

It appears that by the 19th century the lawyer-client privilege was firmly entrenched. Any characterization of professionals as mere servants or, a fortiori, any unstated resort to feudal loyalty, had vanished, preventing the new professions founded in that century from justifying any acquisition of a common law privilege. Note, *Functional Overlap Between the Lawyer and Other Professionals: Its Implications for the Privileged Communication Doctrine*, 71 Yale L.J. 1226, 1228–29 (1962).

The difficulty with this rationale is that doctors were not able to maintain their privilege in the 18th century, when the "servant's loyalty" theory was supposedly supporting the lawyers. They are "servants" as much as are lawyers; indeed, developmentally English society regarded the "physician" as of somewhat lower social class than the lawyers. Perhaps the pundonor of gentlemen-lawyers still lurked in the background; perhaps *stare decisis* and the accident that it was the Duchess of Kingston's physician who was denied an honor-based privilege in 1776, *see* note 3, *supra*, is the explanation; or perhaps the difference is in part explainable because the English bench was and is drawn from the bar, not the medical profession.

In seeking a correct historical basis, the combined concepts of "honor" and "loyalty" provide a much more candid and defensible explanation of the privilege doctrine than do post-enlightenment attempts at rationalization. Although the concepts are ancient, are usually phrased in archaic terminology, and are related to out-dated notions, they are nevertheless firmly entrenched in the modern consciousness. The notion that a professional, as a man of particular personal honor, should not divulge matters learned in the professional relationship is not alien to modern attitudes.

5. *E. g.*, Duchess of Kingston's Case, 20 How. St.Tr. 355, 2 Smith L.C. 754 (12th ed.), 1 East, P.C. 468, 1 Leach 146, [1775–1802] All E. R. Reprint 623, 625–26 (H.L.1776); *Sherman v. Sherman*, 1 Root 486 (Conn. 1793); *see Mathis v. Hildebrand*, 416 P.2d 8 (Alaska 1966); *see generally* 8 J. Wigmore, Evidence § 2380 at 818–19 & n. 3 (McNaughton rev. ed. 1961); 3 Wharton's Criminal Evidence § 563 (13th ed. 1973).

examined in a civil action or proceeding as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient."

This privilege does not extend to criminal cases, however. Criminal Rule 26(a), (b); Civil Rule 43(h)(4). Even if it did, the rule would not cover communications to a psychiatric social worker.[6] *See Fitzgerald v. A. L. Burbank & Co.,* 451 F.2d 670 (2d Cir. 1971).[7]

## II.

 Allred relies on AS 08.86.200 to provide a statutory psychotherapist privilege in criminal cases.[8] The provision nowhere states that it was intended as creating a privilege. It does not refer to courtroom testimony. The general thrust of its language seems to point towards "anti-gossip" considerations. If a testimonial privilege is also included within its ambit, the *statute would be an amendment to Criminal Rule 26. See also* Civil Rule 43(h). Even though passed by a two-thirds majority of both houses,[9] an amendment to a court rule is not effective "unless the bill specifically states that its purpose is to effect such a change." *Leege v. Martin,* 379 P.2d 447, 451 (Alaska 1963); *see also*

Criminal Rule 52. The legislature's addition of a newspaper reporters' privilege, for instance, was accomplished as an express change in the court rules. *See* AS 09.25.-160; § 2 Ch. 115 SLA 1967. This latter measure was enacted during the same session as was the Psychologist Licensure Act, including AS 08.86.200. The legislature's failure to create expressly an evidentiary privilege for psychotherapists while doing so for newspapermen indicates a legislative intent that psychotherapists were not to be so favored. That the bill was referred to the House Judiciary Committee in the course of passage (CSSB 53, 1967 *House Journal of Alaska 676*) is immaterial; we note that the 1973 amendment to this section was not referred to the Judiciary Committee. SB 102, 1973 *House Journal of Alaska 974*.

It is only as an "anti-gossip" measure that AS 08.86.200 makes sense. The statute provides that only a writing may waive whatever rights a patient acquires under the section. But *evidentiary privileges are* traditionally much more easily waived, in light of the strong competing policy in favor of compulsory testimony. *See Mathis v. Hildebrand,* 416 P.2d 8 (Alaska 1966). By enacting AS 08.86.200 as an "anti-gossip" measure the legislature has opened the door to professional licensing sanctions [10]

6. Mrs. Henderson testified that she is not a psychotherapist. She is characterized as a psychiatric social worker by petitioner.

7. Holding a statutory privilege not applicable to a psychiatric social worker in a civil suit. "Because there was no physician-patient privilege at common law, we are reluctant to go beyond the strict language of the statute, and the New York courts have shown no tendency to broaden the types of communications covered [citations]." 451 F.2d at 682. Unlike the Alaska provision, the *Fitzgerald* statute covered a large class of privileged persons, including "a person authorized to practice medicine", a registered nurse, a practical nurse or a dentist (451 F.2d at 681 n. 7), instead of only a "physician or surgeon". *See* Alaska Civil Rule 43(h) (4).

8. AS 08.86.200 provides:
 "*Confidentiality of Communication.* No psychologist or psychological associate may

reveal to another person a communication made to him by a client of his about a matter concerning which the client has employed the psychologist or psychological associate in a professional capacity. This section does not apply to a case conference with other psychologists, psychological associates or with physicians and surgeons, or in the case in which the client in writing authorized the psychologist or psychological associate to reveal a communication."

9. 1967 Senate Journal of Alaska 607 (17 to 3); 1967 House Journal of Alaska 773 (33 to 1, 6 absent); 1973 Senate Journal of Alaska 615 (13 to 5); 1973 House Journal of Alaska 1051 (31 to 6, 3 absent).

10. Although violation of the professional confidences rule under AS 08.86.200 is not a misdemeanor under AS 08.86.210, it may be subject to regulation by the Board of Psy-

and possibly broadened the scope of common law duty [11] in suits against indiscreet psychotherapists.

■ Allred argues that the federal and Alaska [12] constitutions require an evidentiary psychotherapist privilege resulting from the right to privacy, citing *Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and *In re Lifschutz*, 2 Cal.3d 415, 85 Cal.Rptr. 829, 467 P.2d 557, 567–68 (1970). *See* Note, *Psychotherapy and Griswold: Is Confidence a Privilege or a Right?*, 3 Conn.L.Rev. 599, 604 (1971). Since it is apparent that Mrs. Henderson was not a police agent, we do not perceive any state action that would trigger the constitutional privacy guarantees, unlike the situation in *Leyra v. Denno*, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954).[13]

### III.

The question remains whether a common law psychotherapist privilege should be recognized and, if so, what its scope ought to be. As we have seen, the only professional relationship traditionally privileged at common law was that of lawyer and client.[14] Because of the strong need for compulsory testimony, the creation of new privileges is generally looked upon with disfavor by the commentators. *Branzburg v. Hayes*, 408 U.S. 665, 690, n. 29, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); 8 J. Wigmore, Evidence § 2286 (McNaughton rev. ed.1961).

The courts have created privileges in modern times, however, when they have found sufficient policy justification for doing so. *Mullen v. United States*, 105 U.S.App.D.C. 25, 263 F.2d 275, 279 (1959) (Fahy, J., concurring) and *Cook v. Carrol*, [1945] Ir.R. 515 (High Ct., excerpted in 8 J. Wigmore, Evidence § 2394, at 871 [McNaughton rev.ed.1961]), are examples of judicial common law constructions of priest-penitent privileges. The English courts recognize the doctrine of "conversations without prejudice" whereby statements made to marriage counselors who are attempting to effectuate reconciliation cannot be used as evidence in divorce proceedings. *See, e. g., McTaggart v. McTaggart*, 2 [1948] All E.R. Reprint 754, 755 (Ct.App.). At least one Canadian court has followed suit. *In re Kryschuk and Zulynik*, 14 D.L.R.2d 676 (Sask.Magist.Ct.1958). One American trial court has

---

chologist and Psychological Associate Examiners under AS 08.86.080. The Board, after a hearing, can "suspend or revoke the license of a licensed psychologist or psychological associate" under AS 08.86.080 for violation of confidences, once it has adopted regulations on the subject.

11. *Hague v. Williams*, 37 N.J. 328, 181 A.2d 345, 347 (1962), restricted the duty of confidentiality in a civil litigation setting, reasoning that New Jersey policy favored maximum information. It distinguished three out-of-state cases providing a greater privilege, reasoning that each of these three states had physician-patient privilege statutes evincing a strong public policy in favor of confidentiality. *But see Hammonds v. Aetna Casualty & Surety Co.*, 243 F.Supp. 793, 800 (N.D. Ohio 1965). AS 08.86.200 could establish state policy without creating an evidentiary privilege.

12. Alaska Const. art. I, § 22 provides: "The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section."

13. In *Leyra*, the defendant had been interrogated by the police at various times during a four day period about the murder of his parents. When defendant complained of a painful sinus attack the police promised to obtain a physician to help him. Instead they brought a psychiatrist skilled in hypnosis, who persuaded the defendant to confess his guilt. This was held to be a denial of due process of law. The case at bar is distinguishable in that petitioner requested that Mrs. Henderson visit him. Her interview at the police station was not at the instigation of the police.

14. "It is perhaps open to argument whether a privilege for confessions to priests was recognized in common law courts during the period before the Restoration. . . . But since the Restoration, and for more than two centuries of English practice, the almost unanimous expression of judicial opinion (including at least two decisive rulings) has denied the existence of a privilege." 8 J. Wigmore, Evidence § 2394 (McNaughton rev. ed. 1961).

specifically created a psychotherapist-patient privilege as a matter of decisional common law, although the result has been criticized.[15]

In the federal area, the United States Congress is apparently of the opinion that the creation of a psychotherapist-patient privilege is properly one of common law development through court decision. In reducing the privilege sections of the Proposed Federal Rules of Evidence to one general provision, Congress clarified its intent as follows:

"[I]t should be clearly understood that, in approving this general rule as to privileges, the action of Congress should not be understood as disapproving a recognition of a psychiatrist-patient, or husband-wife, or any other of the enumerated privileges contained in the Supreme Court rules. Rather, our action should be understood as reflecting the view that the recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis." Senate Report, Fed.R. Evid. 501, J. Moore, Moore's Federal Practice: Federal Rules of Evidence 501 (1875) 511.

■ Professor Wigmore has proposed four canons to be used as a basis for determining whether, for any particular relationship, a common law privilege is desirable. These are:

"(1) The communications must originate in a *confidence* that they will not be disclosed.

(2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

(3) The *relation* must be one which in the opinion of the community ought to be sedulously *fostered.*

(4) The injury that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation." 8 J. Wigmore, Evidence, § 2285. (Emphasis in original) [16]

In our view the psychotherapeutic relationship satisfies each of these canons. First, communications to a psychotherapist in the course of therapy are inherently confidential. Patients often make statements in psychotherapy which they would not make to even the closest members of their families. Psychotherapy tends to explore the innermost recesses of the personality, the very portions of the self which the individual seeks to keep secret from the world at large. Revelation of such matters could have an irrevocably harmful effect upon the reputation and well being of the patient. *See* Slovenko, *supra* note 15, at 185, 187.

Second, inviolability of the confidence is essential to achievement of the psychotherapeutic goal. Without foreknowledge that confidentiality will attach, the patient will be extremely reluctant to reveal to his therapist the details of his past life and his introspective thoughts and feelings. Without the patient's confidence a psychiatrist's efforts are worthless. In therapy the patient must often lay bare his entire inner life, including his fantasies, his past behavior, and his feelings of guilt or shame. See *Taylor v. United States*, 95 U.S.App. D.C. 373, 222 F.2d 398, 401 (1955) (Edgerton, J.). Third, the relationship between psychotherapist and patient is unquestionably one which should be fostered. Psy-

---

15. *Binder v. Ruvell*, Civil Docket No. 52C2535, Circuit Ct., Cook Co., Ill., *reported in* 15 A.M.A.J. 1241 (1952) ; see Note, *Confidential Communications to a Psychotherapist: A New Testimonial Privilege*, 47 Nw. U.L.Rev. 384 (1952) ; Slovenko, *Psychiatry and a Second Look at the Medical Privilege*, 6 Wayne L.Rev. 175, 196 (1960).

16. These have been criticized as allowing too many privileges in Note, *Functional Overlap Between the Lawyer and Other Professionals: Its Implications for the privileged Communications Doctrine*, 71 Yale L.J. 1226, 1230 (1962). That article favors the psychotherapist privilege, however.

chiatry and its techniques of therapy are relatively young as specialized fields, but they have received widespread recognition as a valid sphere of medical science. Indeed, our legislature has recognized the importance of psychotherapy by prohibiting certain revelations by psychologists and psychological associates in AS 08.86.200, discussed earlier in this opinion. *See also In Re Lifschutz*, 2 Cal.3d 415, 467 P.2d 557, 560 (1970).

Finally, in balancing injury to the relation, by fear of disclosure, against the benefit to justice by compelling disclosure, the scales weigh heavily in favor of confidentiality. We believe that the goals of therapy may be frustrated if the privilege does not attach. Reason indicates that the absence of a privilege would make it doubtful whether either psychotherapists or their patients could communicate effectively if it were thought that what they said could be disclosed compulsorily in a court of law. We are also aware of the delicate position occupied by the psychotherapist himself. Because of the special nature of a patient's confidences,[17] the psychotherapist is subject to an even more stringent honorable obligation not to disclose, under any circumstances, than are other professionals. We do not wish psychotherapists to be faced with the dilemma of either violating this extraordinary trust or being incarcerated. *See In re Lifschutz, supra*, at 559–60, 565–66.

■ In conclusion, we recognize a common law privilege, belonging to the patient, which protects communications made to psychotherapists in the course of treatment.[18]

## IV.

We now turn to a consideration of the scope of the privilege.[19] At the outset it appears to us that the psychotherapist privilege cannot be extended to all manner of counselors, social workers, and psychological associates. The number of persons engaged in such capacities is so great that it is hard to estimate the number of relationships and conversations which would fall within the privilege. Moreover, it appears to us that there is a substantive difference between the activities comprehended under the term "psychotherapy" and those covered by the fields of counseling and psychiatric social work.

Much psychological counseling has as its direct or indirect goal the improvement of the client or patient in his current adaptation to reality, his relationships with others, and his ability to handle his personality problems more adequately. But this does not mean that all forms of psychological counseling should be equated with "psychotherapy" in the serious sense of that term. Psychotherapy literally means "treatment of the mind." It commonly refers to the use of psychological means to modify mental and emotional disorders of a serious, disabling nature. In its technical application the therapist, through interview sessions, verbally explores the patient's conflicts, feelings, memories and fantasies in order to provide insight into the causes of the disorder. Encyclopedia of Psychology, at 100 (N.Y.1972). "Psychotherapy" im-

17. *See* Slovenko, *Psychiatry and a Second Look at the Medical Privilege*, 6 Wayne L.Rev. 175, 187, 194 (1960). The degree of intense personal privacy involved is such that psychotherapeutic communications must be distinguished from communications involved in other professional relationships, such as financial communications to a banker. The obligation of the psychotherapist is correspondingly greater than that of the banker.

18. This privilege is in some respects analogous to the physician-patient privilege, and may be waived. *See* 8 Wigmore, Evidence, §§ 2388–91 (McNaughton rev. ed. 1961); C. McCormick, Evidence, § 80, at 164, §§ 105, 106 (1954); *Mathis v. Hildebrand*, 416 P.2d 8 (Alaska 1966).

19. This portion of the opinion represents the views of the author and Justice Erwin. The views of the other justices participating in this case are stated in their separate opinions.

plies treatment by medical personnel, or treatment by non-medical professionals (clinical psychologists) who are as well trained as physicians to employ psychological methods of treating emotional and personality disturbances.[20]

By contrast "counseling" most often refers to psychological efforts of a non-medical nature, administered by non-medical personnel. Counseling is aimed not primarily at uncovering deep psychological processes but at enabling the client to make more effective use of his present resources. Counseling includes vocational, educational, employee, rehabilitation, marriage, and personal guidance within its spheres of operation.

An additional distinction between psychotherapy and counseling must be drawn according to the type of training which is a prerequisite for practicing each of those fields of endeavor. Counselors may have little or no training in formal psychology and methods of treatment.[21] Psychotherapy should be practiced only by persons who have undergone rigorous intellectual and practical training. Only psychiatrists, who are medically qualified, and a limited number of professional psychologists should be permitted to practice psychotherapy. Professor J. Hadley, Clinical and Counseling Psychology (N.Y.1958) 560, states that to be adequately prepared to practice as a clinical or counseling psychologist one should have earned a Ph.D. in psychology, and should have received additional training in specific applications of psychology to clinical problems. The American Board of Examiners in Professional Psychology requires a doctorate plus five years of ex-

perience in order to achieve certification. Id., 561. It is only a few highly qualified psychologists who should practice psychotherapy at all, and even then it should be done in collaboration with licensed medical personnel in all but exceptional instances. Id. 611–617. *See also* W. Menninger, "The Relationship of Clinical Psychology and Psychiatry", American Psychologist, 3, 4 (1950).

Moreover, counseling is considerably more superficial and less searching than what we understand to be included within the term "psychotherapy". Counseling either does not, or should not, have as its aim a deep penetration into the psychic processes of the patient or client. The need for a privilege to foster the counsel-client relationship is, correspondingly, less readily apparent. It is true that clients of counselors may reveal incriminating or degrading facts about themselves, but this cannot be considered a necessary concomitant of the counseling relationship. Such revelations are more in the nature of an unintended byproduct of the counseling activity. Such utterances are neither essential nor necessary to the successful realization of the counseling goal. There may be instances in which counselors attempt to uncover the intimate, personal secrets of their clients, but we do not view such activity to be essential or proper to the counseling function. In any event, such occurrences would not provide sufficient justification for extending an evidentiary privilege to the field of counseling as a whole.

We note that the legislature has drawn a similar distinction in the statutes regulating the practice of professional psychology.

---

20. Psychotherapy to some persons connotes an exhaustive, lengthy analysis of the patient's personality pursuant to the doctrinal tenets and working methods established by Sigmund Freud. This is not invariably the case. There are other medically developed schools of psychotherapy including, but not limited to, Adlerian, Jungian, psychobiological (Adolph Meyer), neo-Freudian (Horney, Sullivan, Fromm), and existential approaches.

21. How vague the term "counseling" is, even among those who teach and practice in the field, is illustrated by the following statement: "The individual who is known as a professional counselor might range all the way from someone who has just completed several semester hours of training, to someone whose name might happen to be Rogers or Freud or Menninger or May, but . . . it at least involves two human beings. . . ." D. Arbuckle, Counseling: Philosophy, Theory and Practice (Boston 1970) 3.

To be a licensed psychologist in Alaska one must hold a doctoral degree in psychology from an accredited school, must have at least one year's experience acceptable to the Board of Psychologist and Psychological Associate Examiners, and must have passed an examination given by the board. AS 08.86.120–.130. To be licensed as a psychological associate in Alaska it is necessary that the applicant hold a master's degree from an accredited or approved educational institution, with at least 24 credit hours of course work directly related to counseling or another specialized area in which licensure is requested, including a practicum, that he have three years' experience within the past ten years, two of which are in Alaska, including one year of supervised postgraduate experience acceptable to the board, and that he have the recommendation of his immediate supervisor, if a licensed psychologist, or two licensed psychologists. AS 08.86.162. He must also pass an examination. AS 08.86.160.

Statutorily only a psychologist may practice psychology. AS 08.86.170. A psychological associate may practice counseling AS 08.86.190. A psychologist may employ psychotherapeutic techniques in his practice. AS 08.86.230(2)(B). A psychological associate may only employ counseling techniques. AS 08.86.230(7)(B). While the statutory definitions are not too helpful about the distinction between psychotherapeutic techniques and counseling techniques, it is noteworthy that the legislature employed a sharp semantic demarcation between them. The statutes do evince a policy that psychotherapy be practiced only by licensed psychologists, and that others such as psychological associates be limited to the practice of counseling.[22] If even psychological associates, whose qualifications are considerable, may not practice psychotherapy, it follows that the legislature did not intend that persons with lesser qualifications should practice psychotherapy. We find this legislative distinction helpful, not because it sets the boundaries of the privilege—to us a matter of common law development—but because it evinces the public policy of Alaska and fortifies us in deciding a question of common law. See *S.L. W. v. Alaska Workmen's Compensation Board,* Alaska, 490 P.2d 42, 45, 46 (1971).

We believe that the psychotherapist-patient privilege can be held within proper bounds—while still fulfilling the purposes of the privilege—by using a two-fold test of applicability. The first criterion focuses upon the professional status of the person to whom the communication is made. As we have shown above, the evidentiary privilege should extend only to communications made to a psychiatrist or a licensed psychologist.[23] The second criterion focuses upon the type of communication in question. We believe that the evidentiary privilege should extend to communications made in the course of intensive, deep psychotherapy, of the type which requires confidentiality for its success. This necessarily includes communications made in the course of diagnostic interviews and examinations which might reasonably lead to psychotherapy, as we have delineated that term. Excluded from the privilege, for example, would be statements made by a pa-

---

22. The statutory prohibitions on the practice of psychology and counseling contain exceptions as to persons employed by a governmental unit, an educational institution, and private agencies, under certain conditions. These exceptions, although broad, do not obliterate the basic, normative differentiation between psychotherapy and counseling.

23. The "requirement that the psychologist be in fact licensed, and not merely believed to be so, is believed to be justified by the number of persons, other than psychiatrists, pur-

porting to render psychotherapeutic aid and the variety of their theories." Advisory Committee Note, Proposed Federal Rule of Evidence 504(a)(2), 51 F.R.D. 315, 368 (1971). It should here be noted that State Editions, Code of Evidence of California, §§ 1010, 1028, makes an exception to California's statutory psychotherapist privilege. Only a psychiatrist or licensed psychologist maintains a privilege in criminal cases, while clinical social workers and the like are required to testify.

tient to a psychiatrist or psychotherapist outside of the therapeutic relationship.

In brief, the test can be stated as follows:

1. Was the communication made to a psychiatrist or a licensed psychologist?

2. Was the communication made in the course of psychotherapeutic treatment, or of examinations or diagnostic interviews which might reasonably lead to psychotherapeutic treatment?

If both these questions are answered affirmatively the privilege applies.[24]

Measured against this test, it is apparent that Allred's statements to Mrs. Henderson do not qualify as privileged, as she was neither a psychiatrist nor a licensed psychologist, and the statements were not given in the course of psychotherapeutic treatment.[25]

Allred asserts that a distinction between licensed and unlicensed practitioners is a violation of the "equal protection" clauses of the state and federal constitutions.[26] He argues that the psychiatric social worker is "the poor man's psychiatrist," and that limiting the evidentiary privilege to licensed practitioners results in impermissible practical discrimination based on wealth.

We stated in *Ravin v. State*, 537 P.2d 494, 498 (Alaska 1975), that where the right to privacy is involved,

"we will require that the relationship between means and ends be not merely reasonable but close and substantial."

Since an evidentiary privilege affects some of the same concerns as does the right to privacy, we adopt the *Ravin* test in the instant case. We find, however, that the line we have drawn is a means closely and substantially related to our ends. The need for an evidentiary privilege decreases with the privacy of the communications involved, and hence with the "depth" of psychological probing and the seriousness of the case. This gradation can be equated, roughly, to the skill and training of the practitioner. The dividing line chosen provides a workable estimate of this skill and training. As with any drawing of lines, no absolute certainty is possible, but the line is not drawn arbitrarily or as a matter of caprice.

Allred argues that only a compelling state interest will suffice to uphold this distinction, on the authority of *San Antonio Ind. School Dist. v. Rodriguez*, 411 U. S. 1, 20–21, 93 S. Ct. 1278, 36 L.Ed.2d 16, (1973). There the United States Supreme Court indicated that wealth discriminations would require strict scrutiny only if the facts involved an "absolute deprivation" of the benefit at issue, because the disadvantaged persons were "completely unable to pay." Allred does not offer sufficient data to substantiate this constitutional claim.[27]

---

24. The terms within this test should be understood as implying the limitations placed upon them in the earlier discussion in this opinion. There may, of course, be cases in the future which pose interpretative problems and which must be decided upon their particular merits. We do not reach the question of whether psychotherapeutic communications made to a medical practitioner who is not a psychiatrist are within the privilege.

25. It is this point which accounts for the basic split between this opinion and the separate opinion of Justice Rabinowitz. Justice Erwin and I are unable to perceive how, through any semantic feat, Mrs. Henderson can be considered a psychotherapist, or how

her contacts with Allred at the Langdon Clinic can constitute psychotherapy. It is of major significance that in her testimony Mrs. Henderson stated that she is not a psychotherapist.

26. "This constitution is dedicated to the principles . . . that all persons are equal and entitled to equal . . . protection under the law . . . ." Alaska Const. art. I, § 1; *see* U.S.Const. amend XIV, § 1.

27. In view of the widespread availability of social and health services for economically disadvantaged persons, we will not assume that such persons are absolutely deprived of psychiatric and psychological services by licensed personnel.

■ In conclusion, a majority of this court agrees that a common law psychotherapist-patient privilege obtains in Alaska. One member of the panel sitting on this case believes that the statutory privilege covers Allred's communications. Two members are of the opinion that the common law privilege covers Allred's communication. Two of us, the author of this opinion and Erwin, J. are of the view that the privilege does not extend to Allred's communication. Accordingly, the ruling of the superior court is remanded for further proceedings consistent with the holding of a majority of this court.

BURKE, J., not participating.

BOOCHEVER, C. J., concurring.

RABINOWITZ, J., concurs in separate opinion in which DIMOND, J. Pro Tem., joins.

DIMOND, J. Pro Tem., concurring.

BOOCHEVER, Chief Justice (concurring).

Because I believe that the statute establishing a privilege for communications made by a client to a psychologist or psychological associate is here controlling, it seems to me that the question of the existence of a common-law privilege need not be reached. AS 08.86.200 provides:

No psychologist or psychological associate may reveal to another person a communication made to him by a client of his about a matter concerning which the client has employed the psychologist or psychological associate in a professional capacity. This section does not apply to a case conference with other psychologists, psychological associates or with physicians and surgeons, or in the

case in which the client in writing authorized the psychologist or psychological associate to reveal a communication.

A literal reading of this section indicates that a psychological associate is prohibited from revealing "to another person a communication made to him by a client of his about a matter concerning which the client has employed the psychologist or psychological associate in a professional capacity".

Mrs. Henderson was employed[1] by Mr. Allred in a professional capacity. She characterized the session during which Allred made his confession as a "therapeutic session". Assuming that Mrs. Henderson was acting as a psychological associate, the communication clearly comes under the provisions of AS 08.86.200. The scope of the statute in no manner is limited to communications other than in court. In fact, the statute expressly excludes certain communications, specifying:

This section does not apply to a case conference with other psychologists, psychological associates or with physicians and surgeons, or in the case in which the client in writing authorized the psychologist or psychological associate to reveal a communication.

Had the legislature also intended to exclude communications in court, it could easily have added such a provision. Under the well-recognized rule of construction, expressio unius est exclusio alterius,[2] the exclusion of specified communications from the statute indicates an intent not to exclude additional communications such as those made in court. Therefore, unless there is some other reason for not applying the plain meaning of the statute, AS 08.-86.200 generally prohibits courtroom testi-

---

1. The fact that the services were provided by the state cannot be regarded as altering the relationship between the client and psychologist. "Employed" must be construed as meaning "consulted" or "utilized". Otherwise, the statute would violate state and federal "equal protection" provisions in making the privilege depend on one's ability

to pay for the services involved. *Cf. San Antonio School District v. Rodriquez*, 411 U.S. 1, 20–25, 93 S.Ct. 1278, 36 L.Ed.2d 16, 35–38 (1973); *Modrok v. Marshall*, 523 P. 2d 172, 176–77 (Alaska 1974).

2. *See*, generally, Sutherland, Statutory Construction, Vol. 2, §§ 4915–7 (3d ed. 1943).

mony in situations such as presented in the instant case.

The majority opinion relies in part upon the contention that if AS 08.86.200 establishes a testimonial privilege, it would constitute an amendment to Criminal Rule 26 which recognizes certain other privileges. That conclusion is based upon assumption that the establishment of the psychologist-client privilege is a procedural matter rather than a substantive matter. Under the Alaska Constitution, the supreme court is granted the power to promulgate rules governing practices and procedures in civil and criminal cases in all courts, which rules may be changed by the legislature by a two-thirds vote of the members elected to each house.[3] We have held that an amendment to a court rule is not effective "unless the bill specifically states that its purpose is to affect such a change".[4] While AS 08.86.200 was passed by more than a two-thirds majority of both houses, the bill did not specifically state that its purpose was to effect a change in the court's rule.

We note, however, that AS 08.86.200 does not alter or amend the privileges established under Criminal Rule 26, for that rule does not address the question of whether or not there should be a psychologist-patient privilege. The statute in question is of broad scope and only incidentally affects court procedures. The psychologist is prohibited from revealing his client's communications to any other person. Thus a substantive right is established on behalf of the client which is independent of court proceedings but which has an incidental ef-

fect on those proceedings. The line between substance and procedure is difficult to draw, but in this case, it seems to me that the statute, while having some procedural effects, is basically substantive. The situation is similar to that addressed in *Channel Flying, Inc. v. Bernhardt,* 451 P.2d 570 (Alaska 1969), involving a statute providing for the peremptory disqualification of judges. We stated:

This statute does not merely regulate procedure. With or without it the particular action in court takes the same course. The statute rather creates and defines a right—the right to have a fair trial before an unbiased and impartial judge. This is something more than merely prescribing a method of enforcing a right. The main subject matter of the statute is substantive in nature and was within the province of the legislature to deal with. AS 22.20.022 is not invalid as an attempt to usurp the rule-making powers of this court insofar as it provides for a peremptory disqualification of a judge.[5]

The majority relies in part on the fact that the same session of the legislature which enacted AS 08.86.200 established a newspaper reporters' privilege, and in so doing, specifically indicated a purpose of changing the court rules. The newspapermen's privilege set forth in AS 09.25.150–220 applies only to court procedures. The sections do not prohibit a reporter from revealing the source of information and is limited to regulating the procedure under which a court is to determine whether to require the reporter to testify.[6] While some

---

3. Art. IV, sec. 15, Alaska Constitution.

4. *Leege v. Martin,* 379 P.2d 447, 451 (Alaska 1963) ; *see also City of Valdez v. Valdez Development Co.,* 506 P.2d 1279 (Alaska 1973).

5. 451 P.2d at 576 (footnote omitted). The majority of jurisdictions hold that the issue of privilege is a matter of substantive law. *See,* for example, Annot., 95 A.L.R.2d 320, discussing the substantive procedural distinction as applied to privileges in matters of Federal jurisdiction in diversity cases.

6. AS 09.25.160 specifies:
 (a) When a public official or reporter claims the privilege in a cause being heard before the supreme court or a superior court of this state, a person who has the right to question him in that proceeding, or the court on its own motion, may challenge the claim of privilege. The court shall make or cause to be made whatever inquiry the court thinks necessary to a determination of the issue. The inquiry may be made instanter by way of questions put to the witness

aspects of the statute create a substantive right of the reporter, the provisions weigh heavily on the procedural rather than the substantive side of the hazy line to which we have previously referred.

The final reason advanced by the majority in its contention that AS 08.86.200 should not apply is that a literal reading of the statute would allow waiver only by written authorization which is opposed to the traditional method of waiving other evidentiary privileges. There is, of course, no reason why a different method from the customary one may not be prescribed for waiving a specific privilege. Moreover, the manner of waiver as far as court proceedings are concerned would appear to be purely procedural, and that provision of the statute may well not be binding on the court. . In any event, we are not confronted with the question of whether another type of waiver would be effective.

We have finally for consideration the question of whether Mrs. Henderson is to be regarded as a psychological associate so as to come under the provisions of the statute. If, as I contend, AS 08.86.200 is made the source of the evidentiary privilege, then the scope of the privilege may likewise be dependent upon the statutory provisions. AS 08.86.200 applies to a "psychologist or psychological associate". AS 08.86.230 defines a "psychological associate" as including a "counselor or psychometrist". AS 08.86.230(1) states that a " 'psychologist' means a person who practices psychology", and AS 08.86.230(2) provides that

"to practice psychology" means to apply established principles of learning, motivation, perception, thinking, and emotional relationships to problems of personnel evaluation, group relations and behavior adjustment, including (A) counseling and guidance; (B) using psychotherapeutic techniques with persons or groups of persons who have adjustment problems in the family, at school, or at work; (C) measuring and testing of personality, intelligence, aptitudes, emotions, and attitudes and skills; (D) conducting research on human behavior[.]

Mrs. Henderson worked directly under the supervision of Dr. Aaron Wolf, a psychiatrist, and was assigned by the Langdon Psychiatric Clinic staff as Mr. Allred's counsellor. He often sought her aid in resolving mental and emotional problems, and she worked with Dr. Wolf's staff in attempting to resolve Mr. Allred's mental and emotional problems. She had engaged in some 30–50 extended counselling sessions with him and had been his counsellor for at least a year prior to Allred's arrest. It would appear beyond dispute that she constituted a psychologist or psychological associate under the terms of this statute.

■ Since the legislature by AS 08.86.-200 established a privilege, the communication by Mr. Allred to Mrs. Henderson should not have been revealed in the absence of compliance with the statutory requirement for waiver by Mr. Allred. I would therefore hold that the psychologist privilege applies in the instant case, and that upon retrial, Mrs. Henderson may be permitted to testify as to the communications made to her by Mr. Allred only in the event that Mr. Allred authorizes her to reveal such communications.

RABINOWITZ, Justice, with whom Dimond, Justice Pro Tem joins, concurring.

claiming the privilege and a decision then rendered, or the court may require the presence of other witnesses or documentary showing or may order a special hearing for the determination of the issue of privilege.

(b) The court may deny the privilege and may order the public official or the reporter to testify, imposing whatever limits upon the testimony and upon the right of cross-examination of the witness as may be in the public interest or in the interest of a fair trial, if it finds the withholding of the testimony would

(1) result in a miscarriage of justice or the denial of a fair trial to those who challenge the privilege; or

(2) be contrary to the public interest.

■ While I agree that a common law privilege covering communications between patients and psychotherapists should be recognized, on the particular facts of this case, I would hold that the privilege encompasses the relationship between Mrs. Henderson and Allred.

■ Prior to Allred's conversation with Mrs. Henderson at the jail, they had had numerous extended conferences concerning Allred's emotional problems.[1] Allred was specifically informed that the Langdon Clinic staff had assigned Mrs. Henderson as his counselor and that she would be acting directly under the supervision of Dr. Aaron Wolf, a psychiatrist. Allred often sought her aid in resolving mental and emotional problems. In short, the record demonstrates that Mrs. Henderson was intimately familiar with Allred's problems and occupied a central role in Allred's therapy.[2] Given Professor Wigmore's four canons for determining whether a common law privilege is desirable, and given the conclusion that a psychotherapist-patient privilege should be recognized, then the reason why the privilege ought not extend to the instant case should somehow relate to Wigmore's canons. I fail to see why the rationale which supports a common law privilege is less compelling here than in any case where the psychotherapist-patient privilege is recognized.[3]

The communication in question which took place between Allred and Mrs. Henderson was viewed by them as a therapeutic session in which Allred discussed his mental problems and looked to Mrs. Henderson for advice and counseling. Allred requested Mrs. Henderson's presence for the purpose of counseling. He talked to her because he needed counseling. His candor with Mrs. Henderson was based on the belief that he was in therapy with his counselor.[4] Under the circumstances confidentiality was essential to the relationship between them.

In my opinion Allred's relationship with Mrs. Henderson, initiated to seek mental health, is one which sought to be sedulously fostered by the community. It is not necessarily relationships with psychiatrists or licensed psychologists that ought to be sedulously fostered; rather, what should be fostered is the therapeutic relationship which looks toward improvement of mental

---

1. Mrs. Henderson saw Allred daily for brief periods of time, and they engaged in some 30 to 50 extended counseling sessions. She had been his counselor for at least a year prior to Allred's arrest.

2. Mrs. Henderson was the eyes, ears, and spokeswoman for a therapy group consisting of staff members of various specialties. She would present problems weekly to the group which was led by Dr. Wolf and which consisted of staff members of various specialties. The problems of particular individuals and the resolution of those problems would be discussed among the group. Mrs. Henderson described this therapy as "community therapy." In her own words: ". . . it's where the entire staff works together; in other words it's not one person working with one patient. It's one person, with the help of the rest of the staff, working . . . . It's a case of the entire staff relating everything they know about a particular patient." *Compare* Comment, 61 Cal.L.Rev. 1050, 1055 (1973).

3. If the problem is one of line drawing, as Justice Connor asserts, then I must take issue with the rationale which excludes the compelling factual circumstance of this case. It appears that drawing lines reflects a preoccupation with "floodgate" type arguments which this court has consistently rejected. The concern is that "everyone" should not be able to assert a privilege merely because a conversation with an acquaintance can arguably be styled as "therapeutic." Admittedly, whenever a privilege exists, cases will arise where it is not clear whether the privilege should apply. However, the fact that such cases will arise does not justify the wholesale exclusion of relationships which deserve to be protected by the privilege.

4. Allred asked the police to contact either Dr. Wolf or Mrs. Henderson. He apparently did not indicate a preference for one over the other, believing them both to be his counselors. And in fact when Mrs. Henderson permitted the conversation to be monitored, she requested that its content be ignored. In the words of the police officer who told her of the monitoring, "[s]he was concerned about the privilege."

health. Whatever trust Allred once had in psychotherapists in general, or Mrs. Henderson in particular, would be significantly undermined if we were to exclude therapists in Mrs. Henderson's position. Were it Dr. Wolf instead of his alter ego who testified in court, the damage to the therapy relationship could be no less in its impact. Thus, I conclude that all of the reasons which support the recognition of a psychotherapist-patient privilege in theory call for the application of that privilege to the circumstances of the case at bar.[5]

■ · I agree with the implicit assertion of Justice Dimond that Wigmore's four canons concerning common law privileges are descriptive and not prescriptive. As does Justice Dimond, I find them useful guides on the path to determining whether a psychotherapist-patient privilege ought to be recognized.[6] As I indicated at the outset, for the reasons in Justice Connor's opinion, I find it appropriate to recognize a psychotherapist-patient privilege in criminal proceedings. However, as opposed to the conclusion Justice Connor draws, I believe the privilege extends to the particular relationship between Allred and Mrs. Henderson. Nonetheless, because the statutes in question bear on the holding I reach, I consider it appropriate to comment on AS 08.86.200.

■ The line between substance and procedure can hardly be termed a clear one, as United States Supreme Court cases emanating from *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188 (1938), indicate. An enlightening articulation of the problem of distinguishing between substance and procedure is found in *Guaranty Trust Co. v. York,* 326 U.S. 99, 108, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079, 2085–86 (1945), where Justice Frankfurter, in reviewing a lower court's refusal to apply state law, asserted:

Matters of 'substance' and matters of 'procedure' are much talked about in the books as though they defined a great divide cutting across the whole domain of law. But, of course, 'substance' and 'procedure' are the same key-words to very different problems. Neither 'substance' nor 'procedure' represents the same invariants. Each implies different variables depending upon the particular problem for which it is used. See *Home Ins. Co. v. Dick,* 281 U.S. 397, 409, 50 S.Ct. 338, 74 L.Ed. 926, 934, 74 ALR 701. And the different problems are only distantly related at best, for the terms are in common use in connection with situations turning on . . . different considerations . . . .

The question which Justice Frankfurter faced in *Guaranty Trust Co.,* namely, how

5. Justice Connor seeks to distinguish the instant situation from the general psychotherapist-patient privilege on the grounds that relationships with psychological associates are less "intensely personal." The reasoning which correlates the depth of the patient-therapist relationship with the therapist's fulfillment of state licensing requirements escapes me. The purpose of our licensing requirements is to protect consumers of the service from the charlatan, not to provide the therapist with a license to become "intensely personal." Therapists treat mental and emotional problems and do not necessarily delve into the patient's life with a particular degree of personal intensity.

In view of the community therapy regimen he was undergoing, I cannot conclude that Allred's interview with Mrs. Henderson must have been "less intensely personal" merely because she was neither a licensed psychologist nor a psychiatrist. I must conclude otherwise: Allred had a problem which was sufficiently related to his therapy for him to seek therapeutic help. His participation in the session in prison was in no part qualified with the provision to the effect that, "of course, I won't be as honest with you as I would with Dr. Wolf." *Cf.* Proposed Federal Rules of Evidence 504(a)(2) (1971).

6. I note that in his concurring opinion, Justice Dimond asserts that he would not consider whether society sedulously fosters the relationship. This is a most difficult issue. Although I tend to disagree with Justice Dimond's position, I am willing to give the matter more study since resolution of the question is not necessary, in this case, to the decision I would reach.

to adjudicate " . . . transactions for which rights and obligations are created by one of the States, and for the assertion of which, in case of diversity of the citizenship of the parties, Congress has made a federal court another available forum" (326 U.S. at 101, 65 S.Ct. at 1466, 89 L.Ed. at 2082) relates to the issue confronting this court in the instant petition.

By virtue of its enactment of AS 08.86.-200, the legislature has created certain rights and obligations. These rights and obligations appear substantive in nature precisely because they regulate the way people order their activities.[7] They also, according to Chief Justice Boochever, regulate the way the courts do business.[8] Consequently, if one focuses on the operative effect of a statutory privilege upon court proceedings, support can then be mustered for the conclusion that the privilege is basically procedural in character. On the other hand, if one should focus on the rights accorded by a statutory privilege, it can be concluded that the privilege is substantive.

This distinction between substance and procedure takes on importance here because our Alaska Constitution, Article IV, Section 15, vests the power to make and promulgate rules governing practice and procedure in this court.[9] While the power to create substantive rights is a legislative power, the power to fashion procedures to implement those rights is, by virtue of Article IV, Section 15, judicial.[10] However,

this judicial power to fashion rules of procedure is not absolute. *Leege v. Martin*, 379 P.2d 447 (Alaska 1963). For instance, in *Leege* we noted that Alaska's Constitution provides that the legislature may change court rules of procedure by a two-thirds vote of the members of each house.

Consequently, I would hold, if I were to reach the question of the appropriate construction of AS 08.86.200, that the legislative power to establish privileges as substantive rights does not normally, when exercised, by the mere fact of its exercise, create privileges assertable in the courts. Precisely because privileges are both substantive and procedural, this court should be wary of unwarranted extensions of the legislature's power to create substantive rights which encroach upon the procedural rules arena. In short, a substantive right to silence a witness does not automatically give rise to a procedural right to assert a privilege in a court of this state, unless the law establishing the right constitutes a change of a court rule as discussed in *Leege*.

In ascertaining whether any legislative policy has been articulated concerning the nature of the psychotherapist-patient relationship, AS 08.86.200 *et seq.* stands alone as a clear expression of the legislature's position. I find no expression of a legislative intent to deny individuals in general a right to silence their therapists. Nor do I find any intent to exclude individuals in Allred's situation from the general policy.

---

7. The rationale underlying the removal of detailed laws of privilege from the Federal Rules of Evidence has been explained as based on the notion that " . . . Federal law should not supersede that of the states in substantive areas such as privilege absent a compelling reason." Senate Report No. 93–1277, 93rd Cong., 2d Sess., at p. 7.

8. Compare the following comment found in 2 Moore's Federal Practice Rules Pamphlet 502 (2d ed. 1975):

> Although a privilege may embody state social policies and may regulate persons' conduct outside of the courtroom, its effect in the courtroom is to alter the normal procedural functions of the system.

*See Channel Flying, Inc. v. Bernhardt*, 451 P.2d 570 (Alaska 1969).

9. Art. IV, § 15 provides:

> The supreme court shall make and promulgate rules governing the administration of all courts. It shall make and promulgate rules governing practice and procedure in civil and criminal cases in all courts. These rules may be changed by the legislature by two-thirds vote of the members elected to each house.

10. *Channel Flying, Inc. v. Bernhardt*, 451 P.2d 570 (Alaska 1969).

In short, I find no convincing expression of social policy by the legislative representatives of the people which conflicts with the common law privilege I believe Allred has a right to claim.[11]

In conclusion I wish to reiterate the view that since the basis for recognizing a common law psychotherapeutic privilege is a desire to protect the integrity of a commonly used process which looks to mental health, I would hold the psychotherapist-patient privilege applicable in the instant case.[12]

DIMOND, Justice Pro Tem (concurring).

I concur with Justice Connor in his recognition or creation of a psychotherapist-patient privilege as a matter of decisional common law. But I do not concur with his conclusion that this privilege does not cover the communication made by Allred to Mrs. Henderson. For the reasons stated by Justice Rabinowitz in his separate opinion, I would hold that the privilege extends to the relationship between Mrs. Henderson and Allred.

In determining that there is such a common law privilege, Justice Connor relies upon the four canons proposed by Professor Wigmore. I do not agree that the third canon must be satisfied, i.e., that "The relation must be one which in the opinion of the community ought to sedulously fostered". There may be a day when community opinion does not sedulously foster the relation between psychotherapist and patient. If that day should come to pass, my position is that the privilege should still be recognized.

Professor Wigmore apparently developed his canons to explain privileges then accepted. I feel that the inclusion of a criterion involving community approval is unfortunate if used for any purpose other than in an analysis of how some established privileges arose. I believe that if an antireligious sentiment should sweep the community, the court should still recognize the priest-penitent privilege; and if a substantial majority of the population, because of particular religious tenets, does not believe in medical science, the physician-patient privilege should still apply.

The need for a privilege should not depend upon community approval of the relationship. Rather, it is the purpose of the relationship and its legitimate value to the participants which should be weighed against the truth-finding function of the courts. Some persons feel that religion is of no value to society. If this belief became prevalent, then under the Wigmore canons, the priest-penitent privilege would

---

11. *Compare* note 6, *supra*. Thus in terms of objectives I find our common law privilege to be in harmony with the statutory right. The statutory right bears witness to my conclusion that the relationship in question is one which society sedulously fosters.

12. I believe the privilege applies to cases, such as the instant one, where the unlicensed therapist has engaged in a long-standing treatment routine with the patient under the supervision of a licensed therapist. Of relevance to this position is the following statement of Judge Edgerton, in *Mullen v. United States*, 105 U.S.App.D.C. 25, 263 F.2d 275, 281 (1958): "I think a communication made in reasonable confidence that it will not be disclosed, and in such circumstances that disclosure is shocking to the moral sense of the community, should not be disclosed in a judicial proceeding, whether the trusted person is or is not a wife, husband, doctor, lawyer, or minister." *See also Sinclair v. United States*, 279 U.S. 263, 292, 49 S.Ct. 268, 73 L.Ed. 692 (1929).

In another case, *Taylor v. United States*, 95 U.S.App.D.C. 373, 222 F.2d 398, 401 (1955), Judge Edgerton observed " . . . a psychiatrist must have his patient's confidence or he cannot help him." Judge Alverson of the Superior Court of Atlanta is quoted by Professor Solvenko in his article as asserting that "without a promise of secrecy from the therapist, buttressed by a legal privilege, a patient would not be prone to reveal personal data which he fears might evoke social disapproval." R. Solvenko, *Psychiatry and a Second Look at the Medical Privilege*, 6 Wayne L.Rev. 186–87. Judge Alverson includes under the rubric "'psychotherapist" all persons who use psychoanalytic techniques, including lay social workers. *Id.* at 200, n. 78.

disappear. As to that privilege, one of the major considerations is the emphasis and firm belief of the participants in the value of the relationship. Legal doctrine will not affect the practice of that relationship, nor would legal sanctions be effective in breaching the already existing confidentiality. Thus, the truth-finding function of the courts would not be advanced by non-recognition of the privilege.

Another consideration is the effectiveness of the relationship in terms of the legitimate and valuable goals of that relationship. The purpose of the physcian-patient relationship is to promote the physical well-being of the patient. The effectiveness of modern medical science would not be affected at all by the belief of the community in the value of that relationship. Therefore, if community approval for the relationship vanishes, the legitimate interests of the parties to the relationship should still be recognized.

The psychotherapist-patient privilege is somewhat analogous to both the priest-penitent privilege and the physician-patient privilege. Like the priest-penitent privilege, the relationship between psychotherapist and patient often involves a central part of a person's life. The trust and confidence placed in the psychotherapist is often as deep, if not deeper, than that placed in a priest. Like a physician-patient relationship, the main purpose of the relationship between the psychotherapist and the patient is the well-being of the patient—emotional, mental and frequently physical.

Furthermore, often the purpose of the psychotherapist-patient relationship is the prevention and curing of antisocial behavior, such as the thereapy in the instant case. If this type of activity is successful, then many potential crimes will not be committed. The prevention of a number of similar defendants being prosecuted in future cases is more than an adequate balance for the hampering of the truth-finding function in an individual case.

Psychotherapy is a relatively new endeavor, and as with all growing sciences, may not be adequately understood by the community. But it is its effectiveness, *i.e.,* its central value to the participant and legitimate purposes which are to be considered, and not the community's conscious approval. Community approval, although perhaps some evidence of value, is only a secondary indication of what I feel to be the primary considerations.

I believe that regardless of community opinion, a psychiatrist's efforts to help an emotionally or mentally disturbed person would be fruitless if the patient did not place his entire trust in the psychiatrist and did not have complete confidence that their communications would never be revealed to others.

Psychotherapy could never be successful without such trust and confidence.

Justice Connor recognizes this by stating that without the patient's confidence, a psychiatrist's efforts are worthless, and that "in therapy a patient must often bare his entire inner life, including his fantasies, his past behavior, and his feelings of guilt or shame". He cites the case of *Taylor v. United States,* 95 U.S.App.D.C. 373, 222 F.2d 398, 401 (1955), where Judge Edgerton, in quoting from Guttmacher and Weihofen, *Psychiatry and the Law,* stated:

The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. * * * It would be too much to expect them to do so if they knew that all they say—and all that the psychiatrist learns from what they say —may be revealed to the whole world from a witness stand.

Professor Wigmore was an eminent authority on the law of evidence. But his "authority" does not require this court to unalterably adhere to every rule that he

proposes. I would dispense with Wigmore's third condition or canon for recognizing the psychotherapist-patient privilege.

Finally, I respectfully suggest that Justice Connor's opinion should not have stated the additional rule of law that the psychotherapist-patient privilege is one "belonging to the patient". This clearly implies that the psychiatrist cannot claim the privilege if the patient waives or abandons. it.[1]

I realize that where the physician-patient privilege is concerned, for example, this is a rule that is generally, if not universally, applied by the courts. And in the few instances where the question has arisen involving the psychotherapist-patient privilege, the same rule has likewise been applied.[2]

But I question its validity in the latter instance. A seriously disturbed patient may very well not realize the consequences of his waiver of the privilege.

Where there has been intense psychotherapy over an extended period of time, it is more likely than not that to force the psychiatrist to breach the trust the patient has placed in him would destroy the psychiatrist-patient relationship, and could result in incalculable harm to the patient. I believe that circumstances may well exist where the psychiatrist should be permitted to assert the privilege—even in the face of an abandonment or waiver of the privilege by the patient—for the best welfare of the patient.

I do not propose to elaborate on this subject further for the reason that whether the psychotherapist-patient privilege is one belonging solely to the patient and may not be asserted by the psychiatrist is a question not involved in this case. Justice Connor's statement on this subject is dictum, *i.e.,* a statement of a principle of law not essential to the determination of the ultimate issue in this case. I believe this question should not be decided here, but should await a case where it is directly involved, and where we have had the advantage of full adversary treatment of the issue, both in the trial court and in this court.

1. *See* 8 Wigmore, § 2386, at 851 (McNaughton Revision 1961) relating to the physician-patient privilege.

2. *In re Lifschutz,* 2 Cal.3d 415, 85 Cal. Rptr. 829, 467 P.2d 557 (1970) ; Annot., 44 A.L.R.3d 24, 55–56 (1972).