Clarence G. LUEDTKE, Appellant,

v.

NABORS ALASKA DRILLING, INC., Appellee.

Paul M. LUEDTKE, Appellant,

v.

NABORS ALASKA DRILLING, INC., Appellee.

Nos. S–2074, S–2127.

Supreme Court of Alaska.

Feb. 17, 1989.

Rehearing Denied March 9, 1989.

---

Don Clocksin, Wagstaff, Pope & Clocksin, Cooperating Atty. for the Alaska Civil Liberties Union, Anchorage, and Douglas P. Elliott, Anchorage, for appellant Clarence G. Luedtke.

Charles W. Coe, Smith, Coe & Patterson, P.C., Anchorage, for appellant Paul M. Luedtke.

Mary Poteet, Winner & Associates, Anchorage, for appellee.

Before MATTHEWS, C.J., and
RABINOWITZ, BURKE, COMPTON
and MOORE, JJ.

COMPTON, Justice.

This case addresses one aspect of drug testing by employers. A private employer, Nabors Alaska Drilling, Inc. (Nabors), established a drug testing program for its employees. Two Nabors employees, Clarence Luedtke and Paul Luedtke, both of whom worked on drilling rigs on the North

Slope, refused to submit to urinalysis screening for drug use as required by Nabors. As a result they were fired by Nabors. The Luedtkes challenge their discharge on the following grounds:

1. Nabors' drug testing program violates the Luedtkes' right to privacy guaranteed by article I, section 22 of the Alaska Constitution;

2. Nabors' demands violate the covenant of good faith and fair dealing implicit in all employment contracts;

3. Nabors' urinalysis requirement violates the public interest in personal privacy, giving the Luedtkes a cause of action for wrongful discharge; and

4. Nabors' actions give rise to a cause of action under the common law tort of invasion of privacy.

Nabors argues that the Luedtkes were "at will" employees whose employment relationship could be terminated at any time for any reason. Alternatively, even if termination had to be based on "just cause," such cause existed because the Luedtkes violated established company policy relating to employee safety by refusing to take the scheduled tests.

This case raises issues of first impression in Alaska law including: whether the constitutional right of privacy applies to private parties; some parameters of the tort of wrongful discharge; and the extent to which certain employee drug testing by private employers can be controlled by courts.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Luedtkes' cases proceeded separately to judgment. Because they raised common legal issues, on Nabors' motion they were consolidated on appeal.

### A. Paul's Case.

#### 1. Factual Background.

Paul began working for Nabors, which operates drilling rigs on Alaska's North Slope, in February 1978. He began as a temporary employee, replacing a permanent employee on vacation for two weeks. During his two weeks of temporary work, a permanent position opened up on the rig on which he was working and he was hired to fill it. Paul began as a "floorman" and was eventually promoted to "driller." A driller oversees the work of an entire drilling crew.

Paul started work with Nabors as a union member, initially being hired from the union hall. During his tenure, however, Nabors "broke" the union. Paul continued to work without a union contract. Paul had no written contract with Nabors at the time of his discharge.

During his employment with Nabors, Paul was accused twice of violating the company's drug and alcohol policies. Once he was suspended for 90 days for taking alcohol to the North Slope. The other incident involved a search of the rig on which Paul worked. Aided by dogs trained to sniff out marijuana, the searchers found traces of marijuana on Paul's suitcase. Paul was allowed to continue working on the rig only after assuring his supervisors he did not use marijuana.

In October 1982, Paul scheduled a two-week vacation. Because his normal work schedule was two weeks of work on the North Slope followed by a week off, a two-week vacation amounted to 28 consecutive days away from work. Just prior to his vacation, Paul was instructed to arrange for a physical examination in Anchorage. He arranged for it to take place on October 19, during his vacation. It was at this examination that Nabors first tested Paul's urine for signs of drug use. The purpose of the physical, as understood by Paul, was to enable him to work on offshore rigs should Nabors receive such contracts. Although Paul was told it would be a comprehensive physical he had no idea that a urinalysis screening test for drug use would be performed. He did voluntarily give a urine sample but assumed it would be tested only for "blood sugar, any kind of kidney failure [and] problems with bleeding." Nabors' policy of testing for drug use was not announced until Novem-

ber 1, 1982, almost two weeks after Paul's examination.

In early November 1982, Paul contacted Nabors regarding his flight to the North Slope to return to work. He was told at that time to report to the Nabors office in Anchorage. On November 5, Paul reported to the office where a Nabors representative informed him that he was suspended for "the use of alcohol or other illicit substances." No other information was forthcoming from Nabors until November 16 when Paul received a letter informing him that his urine had tested positive for cannabinoids. The letter informed him that he would be required to pass two subsequent urinalysis tests, one on November 30 and the other on December 30, before he would be allowed to return to work. In response Paul hand delivered a letter drafted by his attorney to the Manager of Employee Relations for Nabors, explaining why he felt the testing and suspension were unfair. Paul did not take the urinalysis test on November 30 as requested by Nabors. On December 14, Nabors sent Paul a letter informing him he was discharged for refusing to take the November 30 test.

### 2. Procedural Background.

Following his discharge, Paul applied for unemployment compensation benefits with the Alaska State Department of Labor (DOL). DOL initially denied Paul benefits for the period of December 12, 1982 through January 22, 1983 on the ground that his refusal to take the urinalysis test was misconduct under AS 23.20.379(a). Paul appealed that decision and on January 27, 1983, the DOL hearing officer concluded that the drug re-test requirement was unreasonable. On that basis, the hearing officer held that Paul's dismissal was not for misconduct. Nabors appealed to the Commissioner of Labor, who sustained the decision of the appeals tribunal.

Paul initiated this civil action in November 1983. He asserted claims for wrongful dismissal, breach of contract, invasion of privacy, and defamation. Nabors moved for and was granted summary judgment on the invasion of privacy claim, on both the constitutional and common law tort theories. Prior to trial Paul voluntarily dismissed his defamation claim. The trial court, in a non-jury trial, held for Nabors on Paul's wrongful dismissal and breach of contract claims.

Paul appeals the trial court's rulings with regard to his wrongful dismissal, breach of contract, and invasion of privacy claims.

### B. Clarence's Case.

### 1. Factual Background.

Clarence has had seasonal employment with Nabors, working on drilling rigs, since the winter of 1977–78. Prior to beginning his first period of employment, he completed an employment application which provided for a probationary period.

In November 1982 Clarence became subject to the Nabors drug use and testing policy. In mid-November a list of persons scheduled for drug screenign was posted at Clarence's rig. His name was on the list. The people listed were required to complete the test during their next "R & R" period.[1] During that next "R & R" period Clarence decided he would not submit to the testing and informed Nabors of his decision.

Nabors offered to allow Clarence time to "clean up" but Clarence refused, insisting that he thought he could pass the test, but was refusing as "a matter of principle." At that point Nabors fired Clarence. The drug test that would have been performed on Clarence was the same as that performed on Paul.

### 2. Procedural Background.

Following his discharge Clarence also sought unemployment compensation benefits with the DOL. Nabors objected because it believed his refusal to submit to the drug test was misconduct under AS 23.20.379(a). After a factual hearing and two appeals, the Commissioner of Labor found that "Nabors has not shown that there is any connection between off-the-job

---

1. Clarence worked the same schedule as Paul— two weeks on the rig, one week off.

drug use and on-the-job performance." Thus, there was no showing that Nabors' test policy was related to job misconduct. Furthermore, the Commissioner adopted factual findings that 1) no evidence had been submitted by Nabors linking off-duty drug use with on-the-job accidents, and 2) Nabors was not alleging any drug use by Clarence.

Clarence filed his complaint in this case in November 1984. He alleged invasion of privacy, both at common law and under the Alaska Constitution, wrongful termination, breach of contract, and violation of the implied covenant of good faith and fair dealing. The trial court granted summary judgment in favor of Nabors on all of Clarence's claims. No opinion, findings of fact or conclusions of law were entered.

Clarence appeals the award of summary judgment on all counts.

## II. DISCUSSION

### A. The Right to Privacy.

The right to privacy is a recent creation of American law. The inception of this right is generally credited to a law review article published in 1890 by Louis Brandeis and his law partner, Samuel Warren. Brandeis & Warren, *The Right to Privacy*, 4 Harv.L.Rev. 193 (1890). Brandeis and Warren observed that in a modern world with increasing population density and advancing technology, the number and types of matters theretofore easily concealed from public purview were rapidly decreasing. They wrote:

> Recent inventions and business methods call attention to the next step which must be taken for the protection of the person, and for securing to the individual what Judge Cooley calls the right "to be let alone." Instantaneous photographs and newspaper enterprise have invaded the sacred precincts of private and domestic life; and numerous mechanical devices threaten to make good the predic-

tion that "what is whispered in the closet shall be proclaimed from the housetops." *Id.* at 195 (footnotes omitted). Discussing the few precedential cases in tort law in which courts had afforded remedies for the publication of private letters or unauthorized photographs, Brandeis and Warren drew a common thread they called "privacy." They defined this right as the principle of "inviolate personality." *Id.* at 205.

While the legal grounds of this right were somewhat tenuous in the 1890's, American jurists found the logic of Brandeis and Warren's arguments compelling. The reporters of the first Restatement of Torts included a tort entitled "Interference with Privacy."[2] By 1960, Professor Prosser could write that "the right of privacy, in one form or another, is declared to exist by the overwhelming majority of the American courts." Prosser, *Privacy*, 48 Calif.L. Rev. 383, 386 (1960). He cited cases in which private parties had been held liable in tort for eavesdropping on private conversations by means of wiretapping and microphones, or for peering into the windows of homes. *Id.* at 390. In addition, while Brandeis and Warren were mainly concerned with the publication of private facts, Professor Prosser identified four different manifestations of the right to privacy: intrusion upon the plaintiff's seclusion; public disclosure of embarrassing private facts; publicity which places the plaintiff in a false light; and appropriation, for the defendant's pecuniary advantage, of the plaintiff's name or likeness. *Id.* at 389. Professor Prosser's categories form the framework of the expanded tort of invasion of privacy found in the Restatement (Second) of Torts.[3]

Eventually the right to privacy attained sufficient recognition to be incorporated in several state constitutions. *See* Alaska Const. art. I, § 22 (adopted 1972); Cal. Const. art. I, § 1 (adopted 1972); Haw.

---

**2.** *See* Restatement of Torts § 867 (1939):

A person who unreasonably and seriously interferes with another's interest in not having his affairs known to others or his likeness exhibited to the public is liable to the other.

**3.** *See* Restatement (Second) of Torts §§ 652A–I (1977).

Const. art. 1, § 6 (adopted 1978); Mont. Const. art. II, § 10 (adopted 1972).

Interpreting the Constitution of the United States, the United States Supreme Court in 1965 held that a Connecticut statute banning the use of birth control devices by married couples was "repulsive to the notions of privacy surrounding the marriage relationship." *Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510, 516 (1965). The Supreme Court wrote that "specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. Various guarantees create zones of privacy." 381 U.S. at 484, 85 S.Ct. at 1681, 14 L.Ed.2d at 514 (citations omitted). Justice Goldberg's concurrence suggested that the right of marital privacy was fundamental to the concept of liberty. *See* 381 U.S. at 486, 85 S.Ct. at 1682, 14 L.Ed.2d at 516 (Goldberg, J., concurring). Since *Griswold* the Supreme Court has found the federal constitutional right of privacy to apply to a number of other situations. *See Cleveland Bd. of Educ. v. La Fleur,* 414 U.S. 632, 640, 94 S.Ct. 791, 796, 39 L.Ed.2d 52, 60 (1974) (maternity leave regulations struck down for "penaliz[ing] the pregnant teacher for deciding to bear a child."); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right of privacy broad enough to encompass a woman's decision whether or not to terminate her pregnancy); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (regulation which made contraceptives less available to unmarried than married couples invalidated). *But see Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (due process clause of Fourteenth Amendment does not confer any fundamental right on homosexuals to engage in acts of consensual sodomy).

Thus, the concept of privacy has become pervasive in modern legal thought. But a clear definition of this right, so fundamental to ordered liberty, has eluded both courts and legal scholars. It is the fundamental nature of the concept that leads to such great difficulty in application. One commentator has written:

> Can ... the protection of privacy provide a base from which to reason, a clue for policy?
>
> The doubt in this regard comes not from the concept's meagerness but from its amplitude, for it has a protean capacity to be all things to all lawyers, and, as often defined and defended, it lacks readily apparent limitations of its own.... [I]f privacy is indeed the most comprehensive of rights, is it not then too vast and weighty a thing to invoke in specific legal settings for specific and narrowly defined purposes?
>
> A legal concept will do us little good if it expands like a gas to fill up the available space. Take the example of justice: One cannot draw the line where it stops, or starts, in law courts, and with good reason, since such comprehensive and philosophical concepts ought to be everywhere felt but nowhere fixed in our imperfect legal institutions. A properly legal concept must be a principle that translates into a rule; and the rule, in turn, must translate into a set of applications. But no such translations are feasible unless we impose some definite conceptual limits.

Gerety, *Redefining Privacy,* 12 Harv.C.R.–C.L.L.Rev. 233, 234 (1977) (footnotes omitted). But Gerety's definition of privacy, "an autonomy or control over the intimacies of personal identity," *id.* at 236, expansive as it seems, is criticized by Professor Tribe for "slight[ing] those equally central outward-looking aspects of self that are expressed less through demanding secrecy, sanctuary or seclusion than through seeking to project one identity rather than another upon the public world." L. Tribe, *American Constitutional Law* § 15–1, at 1303 (2d ed. 1988).

In this case the plaintiffs seek to fit their cases within at least one of four legal frameworks in which the right to privacy has found expression: constitutional law, contract law, tort law, and the emerging mixture of theories known as the public policy exception to the at-will doctrine of employment law.

B. The Right to Privacy Under the Alaska Constitution.

The Alaska Constitution was amended in 1972 to add the following section:

*Right of Privacy.* The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section.

Alaska Const. art. I, § 22. We observe initially that this provision, powerful as a constitutional statement of citizens' rights, contains no guidelines for its application. Nor does it appear that the legislature has exercised its power to apply the provision; the parties did not bring to our attention any statutes which "implement this section."

The Luedtkes argue that this court has never clearly answered the question of whether article I, section 22 applies only to state action or whether it also governs private action. The Luedtkes urge this court to hold that section 22 governs private action. This question was broached in *Allred v. State,* 554 P.2d 411 (Alaska 1976). In *Allred* this court was faced with the question of whether a psychotherapist-patient privilege exists in Alaska. We found the privilege in the common law rather than under the constitutional right to privacy:

Since it is apparent that [the psychotherapist] was not a police agent, we do not perceive any state action that would trigger the constitutional privacy guarantees....

*Allred,* 554 P.2d at 416.

Our dictum in *Allred* comports with traditional constitutional analysis holding that the constitution serves as a check on the power of government: "That all lawful power derives from the people and must be held in check to preserve their freedom is the oldest and most central tenet of American constitutionalism." L. Tribe, *Ameri-can Constitutional Law,* § 1–2, at 2 (2d ed. 1988). In the same vein, we have written in regard to Alaska's constitutional right to privacy: "[T]he primary purpose of these constitutional provisions is the protection of 'personal privacy and dignity against unwarranted intrusions by the State.'" *Woods & Rohde, Inc. v. State, Dep't of Labor,* 565 P.2d 138, 148 (1977) (quoting *Weltz v. State,* 431 P.2d 502, 506 (Alaska 1967) (referring to article I, section 14 guarantees against unreasonable searches and seizures). In *Ravin v. State,* 537 P.2d 494, 499 (Alaska 1975), we quoted the Supreme Court's statement that

fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy.

(quoting *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542, 549 (1969)).

In *United States Jaycees v. Richardet,* 666 P.2d 1008, 1013 (Alaska 1983), this court expressly held that article 1, sections 1 and 3 of the Alaska Constitution apply only to state action.[4] In that case plaintiff challenged the membership policies of the Jaycees that specifically excluded women from full membership. The court observed that article 1, section 1 guarantees equality "under the law," suggesting a limit only on legal power. But the court held that section 3, which contains an absolute ban on sexual discrimination without mention of state or private action, also required state action as a general principle. The court wrote: "[T]he American constitutional theory is that constitutions are a restraining force against the abuse of *governmental* power...." 666 P.2d at 1013 (quoting *Baker v. City of Fairbanks,* 471 P.2d 386, 394 (Alaska 1970)) (emphasis in original).

We are aware, however, of constitutional clauses which prohibit private action. The

---

4. Alaska Const. art. 1, § 1 provides:

*Inherent Rights.* This constitution is dedicated to the principles that all persons have a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry; that all persons are equal and entitled to equal rights, opportunities, and protection under the law; and that all persons have corresponding obligations to the people and to the State.

Alaska Const. art. 1, § 3 provides:

*Civil Rights.* No person is to be denied the enjoyment of any civil or political right because of race, color, creed, sex, or national origin. The legislature shall implement this section.

Thirteenth Amendment of the United States Constitution, prohibiting slavery, applies to private action. *See, e.g., Clyatt v. United States*, 197 U.S. 207, 216, 25 S.Ct. 429, 49 L.Ed. 726, 729 (1905). The privacy clause of the California Constitution has been construed to apply to private action. *See, e.g., Chico Feminist Women's Health Center v. Butte Glenn Medical Soc'y*, 557 F.Supp. 1190, 1202–03 (E.D.Cal.1983) (woman's choice regarding abortion protected against private interference under state constitutional right to privacy); *Kinsey v. Macur*, 107 Cal.App.3d 265, 165 Cal.Rptr. 608, 612 (1980) (letters regarding defendant's behavior, some of which contained personal facts, stated a cause of action for tortious invasions of constitutional right to privacy). However, the history surrounding the 1972 adoption of the privacy amendment by the voters of California evinces a clear intent that the clause applies to private as well as governmental action. *See White v. Davis*, 13 Cal.3d 757, 120 Cal. Rptr. 94, 105–106, 533 P.2d 222, 233–34 (1975). The promoter's literature contains frequent references to intrusive activities of "government and business." *See id.*

■ The parties in the case at bar have failed to produce evidence that Alaska's constitutional right to privacy was intended to operate as a bar to private action, here Nabors' drug testing program. Absent a history demonstrating that the amendment was intended to proscribe private action, or a proscription of private action in the language of the amendment itself, we decline to extend the constitutional right to privacy to the actions of private parties.

## C. Wrongful Termination.

■ In *Mitford v. de LaSala*, 666 P.2d 1000, 1007 (Alaska 1983), this court held that at-will employment contracts in Alaska contain an implied covenant of good faith and fair dealing. In *Knight v. American Guard & Alert, Inc.*, 714 P.2d 788 (Alaska 1986), we acknowledged that violation of a public policy could constitute a breach of that implied covenant. We wrote:

> The [plaintiff's] claim, concerning alleged termination in violation of public policy, is in accord with a theory of recovery accepted in many states. We have never rejected the public policy theory. Indeed, it seems that the public policy approach is largely encompassed within the implied covenant of good faith and fair dealing which we accepted in *Mitford.*

*Knight*, 714 P.2d at 792 (citations omitted). We conclude that there is a public policy supporting the protection of employee privacy. Violation of that policy by an employer may rise to the level of a breach of the implied covenant of good faith and fair dealing. However, the competing public concern for employee safety present in the case at bar leads us to hold that Nabors' actions did not breach the implied covenant.

### 1. The Luetdkes Were At–Will Employees.

■ First, we address the Luedtkes' arguments that they were not at-will employees, but rather that they could be fired only for good cause.[5] The key difference between these two types of employment is

---

**5.** In this regard, Clarence argues that the decision by the Commissioner of Labor that he was not fired for misconduct should act collaterally to estop Nabors from claiming Clarence was fired for just cause. We disagree.

Both this court and the Supreme Court have discussed standards for using administrative adjudications as collateral estoppel. In *DeNardo v. State*, 740 P.2d 453, 456 (Alaska 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 277, 98 L.Ed.2d 239 ·(1987), we wrote: "it is settled that res judicata precludes relitigation by the same parties, not only of claims raised in the first proceeding, but also of those relevant claims that could have been raised."

In *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642, 661 (1966), the Supreme Court wrote:

> When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had adequate opportunity to litigate, the courts have not hesitated to apply res judicata to enforce repose.

This case fails the tests enunciated by both courts because the issue of Clarence's misconduct is different than the issue of whether Nabors' discharge of Clarence was wrongful. The adjudication before the commissioner did not involve the same issues, nor is the commissioner empowered to determine the culpability of Nabors' conduct. AS 23.20.340.

whether the employment contract is for a determinable length of time. Employees hired on an at-will basis can be fired for any reason that does not violate the implied covenant of good faith and fair dealing.[6] However, employees hired for a specific term may not be discharged before the expiration of the term except for good cause. Neither of the Luedtkes had any formal agreements for a specified term, so any such term, if it existed, must be implied.

In *Eales v. Tanana Valley Medical–Surgical Group, Inc.*, 663 P.2d 958 (Alaska 1983), we held that where an employer promised employment that would last until the employee's retirement age, and that age was readily determinable, a contract for a definite duration would be implied. We also held that no additional considera-

tion need be given the employee to create a contract for a definite term.

The Luedtkes' cases are distinguishable from that of the plaintiff in *Eales*. The Luedtkes received benefits, such as medical insurance and participation in a pension or profit sharing plan, which continued as long as they were employed.[7] However, Nabors never gave an indication of a definite duration for their employment, nor a definite endpoint to their employment. Instead, Nabors merely provided benefits consistent with modern employer/employee relations.

### 2. There Is a Public Policy Supporting Employee Privacy.

The next question we address is whether a public policy exists protecting an employee's right to withhold certain "private" in-

---

6. For a general discussion of the at-will employment doctrine in Alaska see Crook, *Employment at Will: The "American Rule" and Its Application in Alaska*, 2 Alaska L.Rev. 23 (1985).

7. Clarence testified:
 Q Okay. Did anyone make any promise of job security to you?
 A Well, there were little things like, you know, the pension plans, references on a—you know, on a loan for a house or somethin' like that. There was—it was—it was understood and I was—I would infer that, I would get that from that, that, yes, you were a steady personnel (sic), you were permanent.
 Q So, from the fact that you had a pension and the fact that they would be (sic) a reference on a house loan you understood that you would be permanently employed, is that right?
 A Yes.
 Q Were there any other reasons that would make you think you were permanently employed?
 A Profit sharing plan, stock—you know, stock purchase program, things like that.
 Q But no one ever made any statements to you that would lead you to think you were permanently employed, no one ever had any conversations is what I'm getting at.
 A I don't recall right now, I can't say yes or no on that, I'd have to think about that.
 Q But right now you can't—nothing comes to mind as to....
 A No, I would—just like I'd say, anything would be like interpretations, you know, references, things I've mentioned, promotions. I don't think an individual would get a promotion if they were plannin' on lettin' 'em go

two weeks down the line or somethin' like weeks down the line or somethin' like that. If they took you from one position and promoted you to somethin' higher, I can't understand why they'd do that to somebody who was gonna be let go in a couple of weeks, kind of an implication that there would be employment there for you.
 Paul testified:
 A Working on the rig, perform a function, they tell you you're a good hand, you can—you got a home here: at night after work, around the dinner table, nothing formal, you know, but....
 Q So you're not thinking of any one particular instance?
 A No.
 Q Was there any specific time period mentioned? I think you had said a sentence to the effect, you've got a home here. Was any time period mentioned?
 A No.
 Mr. Colver: Objection. Question has been asked and answered.
 Q No, no time period?
 A (Witness nods negatively)
 These "statements" are ambiguous and informal. No specific duration of employment was mentioned.
 Clarence also pleads that because he had a probationary period when he started with Nabors, the end of the probationary period should imply the beginning of employment for a definite term. This implication has been rejected by other courts. *See Rupinsky v. Miller Brewing Co.*, 627 F.Supp. 1181, 1186–87 (W.D.Pa.1986); *Crumley v. Memorial Hospital, Inc.*, 509 F.Supp. 531, 536–37 (E.D.Tenn.1979), *aff'd*, 647 F.2d 164 (6th Cir.1981). We reject it for the purposes of the case at bar.

formation from his employer. We believe such a policy does exist, and is evidenced in the common law, statutes and constitution of this state. In determining the existence of this policy, the Illinois Supreme Court's decision in *Palmateer v. International Harvester*, 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981), is relevant. *Palmateer* involved the discharge of an employee for informing local law-enforcement authorities about the potentially illegal activities of a co-worker. The court held that this discharge violated the public policy supporting citizen involvement in crime prevention. In identifying this public policy, the *Palmateer* court did not rely on a specific statutory prohibition. Rather, it looked to citizen rights, duties and responsibilities. The court wrote:

> There is no precise definition of the term [public policy]. In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions. Although there is no precise line of demarcation dividing matters that are the subject of public policies from matters purely personal, a survey of cases in other States involving retaliatory discharges shows that a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed.
>
> . . . .
>
> No specific constitutional or statutory provision requires a citizen to take an active part in the ferreting out and prosecution of crime, but public policy nevertheless favors citizen crime-fighters.

421 N.E.2d at 878–79, 880 (citations omitted). Thus, we look to the entire body of law in the State of Alaska for evidence of citizen rights, duties and responsibilities, to determine the public policy with regard to employee privacy. *See also Novosel v. Nationwide Ins. Co.*, 721 F.2d 894, 899 (3d Cir.1983) (court derived from United States and Pennsylvania constitutions' free speech guarantees a public policy which prohibited employer from firing employee who re-

fused to participate in employer lobbying effort).

Alaska law clearly evidences strong support for the public interest in employee privacy. First, state statutes support the policy that there are private sectors of employee's lives not subject to direct scrutiny by their employers. For example, employers may not require employees to take polygraph tests as a condition of employment. AS 23.10.037. In addition, AS 18.-80.200(a) provides:

> It is determined and declared as a matter of legislative finding that discrimination against an inhabitant of the state because of race, religion, color, national origin, age, sex, marital status, changes in marital status, pregnancy, or parenthood is a matter of public concern and that this discrimination not only threatens the rights and privileges of the inhabitants of the state but also menaces the institutions of the state and threatens peace, order, health, safety and general welfare of the state and its inhabitants.

This policy is implemented by AS 18.80.-220, which makes it unlawful for employers to inquire into such topics in connection with prospective employment. This statute demonstrates that in Alaska certain subjects are placed outside the consideration of employers in their relations with employees. The protections of AS 18.80.220 are extensive. This statute has been construed to be broader than federal anti-discrimination law. *See Simpson v. Alaska State Comm'n for Human Rights*, 423 F.Supp. 552, 556 (D.Alaska 1976), *aff'd*, 608 F.2d 1171 (9th Cir.1980); *Hotel Employees Local 879 v. Thomas*, 551 P.2d 942, 946, 947 (Alaska 1976); *Loomis Electric Protection, Inc. v. Schaefer*, 549 P.2d 1341, 1343 (Alaska 1976). We believe it evidences the legislature's intent to liberally protect employee rights.

Second, as previously noted, Alaska's constitution contains a right to privacy clause. While we have held, *supra*, that this clause does not proscribe the private action at issue, it can be viewed by this court as evidence of a public policy support-

ing privacy. *See Novosel v. Nationwide Ins. Co.*, 721 F.2d at 900 (finding evidence of public policy in free speech clauses of Pennsylvania and United States Constitutions). The *Palmateer* court wrote that "a matter must strike at the heart of a citizen's social rights, duties, and responsibilities" to be termed a public policy. *Palmateer*, 421 N.E.2d at 878–79. Certainly the fact that the citizenry has incorporated the right to privacy into the Alaska Constitution strongly supports the contention that this right "strike[s] at the heart of a citizen's social rights."

Third, there exists a common law right to privacy. The Restatement (Second) of Torts § 652B provides:

> *Intrusion upon Seclusion* One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

While we have not expressly considered the application of this tort in Alaska, we have recognized its existence. *See Siggelkow v. State*, 731 P.2d 57, 62 (Alaska 1987); *State v. Glass*, 583 P.2d 872, 880–81 (Alaska 1978).

Thus, the citizens' right to be protected against unwarranted intrusions into their private lives has been recognized in the law of Alaska. The constitution protects against governmental intrusion, statutes protect against employer intrusion, and the common law protects against intrusions by other private persons. As a result, there is sufficient evidence to support the conclusion that there exists a public policy protecting spheres of employee conduct into which employers may not intrude. The question then becomes whether employer monitoring of employee drug use outside the work place is such a prohibited intrusion.

**3. The Public Policy Supporting Employee Privacy Must Be Balanced Against the Public Policy Supporting Health and Safety.**

Since the recent advent of inexpensive urine tests for illicit drugs, most litigation regarding the use of these tests in the employment context has concerned government employees. The testing has been challenged under the proscriptions of federal fourth amendment search and seizure law. This body of law regulates only governmental activity, and as a result is of limited value to the case at bar, which involves private activity.[8] However, the reasoning of the federal courts regarding the intrusiveness of urine testing can illuminate this court's consideration of the extent to which personal privacy is violated by these tests.[9]

**8.** Recently a California superior court addressed the question of drug testing of college athletes in *Hill v. National Collegiate Athletic Association*, (Cal.Super. August 10, 1988). As noted *supra*, California's right to privacy applies to both public and private action. *Hill* is clearly grounded on the broad application of California's right. *See Hill*, Slip Op. at 24. Therefore, *Hill*, like cases involving state action, is of limited value in analyzing the case at bar.

**9.** These cases generally analyze the drug testing requirements in the context of fourth amendment search and seizure law. The courts generally hold that the taking of urine is a seizure. As a result, many courts have held that individualized suspicion is necessary before urinalysis may be conducted. *See Policemen's Benevolent Ass'n of New Jersey, Local 318 v. Township of Washington*, 672 F.Supp. 779 (D.N.J.1987) (township police officers); *Taylor v. O'Grady*, 669 F.Supp. 1422 (N.D.Ill.1987) (county depart-

ment of corrections employees); *Amalgamated Transit Union, Local 1277 v. Sunline Transit Agency*, 663 F.Supp. 1560 (C.D.Cal.1987) (transit bus drivers and maintenance workers); *Feliciano v. City of Cleveland*, 661 F.Supp. 578 (N.D. Ohio 1987) (police academy cadets); *American Fed'n of Gov't Employees v. Weinberger*, 651 F.Supp. 726 (S.D.Ga.1986) (department of defense testing of civilian employees holding "critical" jobs); *Lovvorn v. City of Chattanooga*, 647 F.Supp. 875 (E.D.Tenn.1986) (city firefighters); *Capua v. City of Plainfield*, 643 F.Supp. 1507 (D.N.J.1986) (city firefighters).

However, some courts have held that individualized suspicion is not necessary. These courts generally hold that the employee's expectation of privacy is lessened because of the type of employment. In other words, because of the category of job held, the search is "reasonable." *See Jones v. McKenzie*, 833 F.2d 335 (D.C.Cir. 1987) (school bus attendant); *National Treasury Employees Union v. Von Raab*, 816 F.2d 170 (5th

In *Capua v. City of Plainfield*, 643 F.Supp. 1507 (D.N.J.1986), city firefighters sued to enjoin random urinalysis tests conducted by the fire department. The court wrote:

Urine testing involves one of the most private of functions, a function traditionally performed in private, and indeed, usually prohibited in public. The proposed test, in order to ensure its reliability, requires the presence of another when the specimen is created and frequently reveals information about one's health unrelated to the use of drugs. If the tests are positive, it may affect one's employment status and even result in criminal prosecution.

We would be appalled at the spectre of the police spying on employees during their free time and then reporting their activities to their employers. Drug testing is a form of surveillance, albeit a technological one. Nonetheless, it reports on a person's off-duty activities just as surely as someone had been present and watching. It is George Orwell's "Big Brother" Society come to life.

*Id.* at 1511. While there is a certain amount of hyperbole in this statement, it does portray the *potential* invasion that the technology of urinalysis makes possible. It is against this potential that the law must guard. Not all courts view urine testing with such skepticism, believing the intrusion justified in contemporary society.

Judge Patrick Higginbotham assumed a more cynical stance in *National Treasury Employees Union v. Von Raab*, 808 F.2d 1057 (5th Cir.1987) (denying stay pending appeal), *opinion on appeal*, 816 F.2d 170 *cert. granted*, —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988), observing that there is little difference between the intrusiveness of urine testing and the intrusiveness of other affronts to privacy regularly accepted by individuals today. He wrote:

The precise privacy interest asserted is elusive, and the plaintiffs are, at best, inexact as to just what that privacy interest is. Finding an objectively reasonable expectation of privacy in urine, a waste product, contains inherent contradictions. The district court found such a right of privacy, but, in fairness, plaintiffs do not rest there. Rather, it appears from the plaintiffs' brief that it is the manner of taking the samples that is said to invade privacy, because outer garments in which a false sample might be hidden must be removed and a person of the same sex remains outside a stall while the applicant urinates. Yet, apart from the partial disrobing (apparently not independently challenged) persons using public toilet facilities experience a similar lack of privacy. The right must then be a perceived indignity in the whole process, a perceived affront to personal identity by the presence in the same room of another while engaging in a private body function.

It is suggested that the testing program rests on a generalized lack of trust and not on a developed suspicion of an individual applicant. Necessarily there is a plain implication that an applicant is part of a group that, given the demands

Cir.) *cert. granted*, —— U.S. ——, 108 S.Ct. 1072, 99 L.Ed.2d 232 (1988) (customs service employees who work in drug enforcement, carry firearms, or have access to classified information); *McDonell v. Hunter*, 809 F.2d 1302 (8th Cir. 1987) (state department of corrections employees); *American Fed'n of Gov't Employees v. Dole*, 670 F.Supp. 445 (D.D.C.1987) (department of transportation employees concerned with public health, safety, national security and law enforcement).

Some courts have addressed the question of urinalysis tests conducted after conduct has brought the specific employee to the attention of superiors. These courts generally uphold the use of the tests. *See Brotherhood of Maintenance of Way Employees, Lodge 16 v. Burlington N.R.R. Co.*, 802 F.2d 1016 (8th Cir.1986) (railroad employees tested after incident which could have resulted from human error, or after extended furlough); *Division 241 Amalgamated Transit Union v. Suscy*, 538 F.2d 1264 (7th Cir.), *cert. denied*, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976) (bus drivers following serious accident); *Smith v. White*, 666 F.Supp. 1085 (E.D.Tenn.1987) (nuclear power plant employees who were observed using drugs outside work); *Everett v. Napper*, 632 F.Supp. 1481 (N.D.Ga.1986), *aff'd in pertinent part*, 833 F.2d 1507 (11th Cir.1987) (firefighter identified as customer by narcotics dealer); *Allen v. City of Marietta*, 601 F.Supp. 482 (N.D.Ga.1985) (electrical company employees who had been observed smoking marijuana by informer).

of the job, cannot be trusted to be truthful about drug use. The difficulty is that just such distrust, or equally accurate, care, is behind every background check and every security check; indeed the information gained in tests of urine is not different from that disclosed in medical records, for which consent to examine is a routine part of applications for many sensitive government posts. In short, given the practice of testing and background checks required for so many government jobs, whether any expectations of privacy by these job applicants were objectively reasonable is dubious at best. Certainly, to ride with the cops one ought to expect inquiry, and by the surest means, into whether he is a robber. *Id.* at 1061 (Higginbotham, J., concurring). As Judge Higginbotham observes, society often tolerates intrusions into an individual's privacy under circumstances similar to those present in urinalysis. We find this persuasive. It appears, then, that it is the reason the urinalysis is conducted, and not the conduct of the test, that deserves analysis.

This court discussed, on the one hand, the reasons society protects privacy, and, on the other hand, the reasons society rightfully intrudes on personal privacy in *Ravin v. State,* 537 P.2d 494 (Alaska 1975). *Ravin* addressed the issue of whether the state could prohibit the use of marijuana in the home. We held that it could not. We observed that "the right to privacy amendment to the Alaska Constitution cannot be read so as to make the possession or ingestion of marijuana itself a fundamental right." *Id.* at 502. Rather, we "recognized the distinctive nature of the home as a place where the individual's privacy receives special protection." *Id.* at 503.

However, we recognized also that this "fundamental right" was limited to activity which remained in the home. We acknowledged that when an individual leaves his home and interacts with others, competing rights of others collectively and as individuals may take precedence:

> Privacy in the home is a fundamental right, under both the federal and Alaska constitutions. We do not mean by this that a person may do anything at anytime as long as the activity takes place within a person's home. There are two important limitations on this facet of the right to privacy. First, we agree with the Supreme Court of the United States, which has strictly limited the *Stanley* guarantee to possession for purely private, noncommercial use in the home. And secondly, we think this right must yield when it interferes in a serious manner with the health, safety, rights and privileges of others or with the public welfare. No one has an absolute right to do things in the privacy of his own home which will affect himself or others adversely. Indeed, one aspect of a private matter is that it is private, that is, that it does not adversely affect persons beyond the actor, and hence is none of their business. When a matter does affect the public, directly or indirectly, it loses its wholly private character, and can be made to yield when an appropriate public need is demonstrated.

*Id.* at 504.

The *Ravin* analysis is analogous to the analysis that should be followed in cases construing the public policy exception to the at-will employment doctrine. That is, there is a sphere of activity in every person's life that is closed to scrutiny by others.[10] The boundaries of that sphere are

---

**10.** Courts in other jurisdictions have specifically found a public policy supporting the protection of employee privacy. In *Cordle v. General Hugh Mercer Corp.,* 325 S.E.2d 111 (W.Va.1984), the West Virginia Supreme Court held that an employer's demand that employees take a polygraph test violated that state's publicly recognized interest in privacy and resulted in a cause of action for wrongful discharge. The court stated: "[T]he public policy against such testing is grounded upon the recognition in this State of

an individual's interest in privacy." 325 S.E.2d at 117. *But see Larsen v. Motor Supply Co.,* 117 Ariz. 507, 573 P.2d 907 (App.1977) (discharge upheld where at-will employees refused to sign consent to submit to a psychological stress evaluation test).

In *Cort v. Bristol–Myers Co.,* 385 Mass. 300, 431 N.E.2d 908 (1982), the Massachusetts Supreme Judicial Court considered whether employees could refuse to answer certain questions

determined by balancing a person's right to privacy against other public policies, such as "the health, safety, rights and privileges of others." *Ravin*, 537 P.2d at 504.

The Luedtkes claim that whether or not they use marijuana is information within that protected sphere into which their employer, Nabors, may not intrude.[11] We disagree. As we have previously observed, marijuana can impair a person's ability to function normally:

> The short-term physiological effects are relatively undisputed. An immediate slight increase in the pulse, decrease in salivation, and a slight reddening of the eyes are usually noted. There is also impairment of psychomotor control.

*Ravin*, 537 P.2d at 506.

We also observe that work on an oil rig can be very dangerous. We have determined numerous cases involving serious injury or death resulting from accidents on oil drilling rigs.[12] In addition, in Paul's case the trial court expressly considered the dangers of work on oil rigs. It found:

> 13. It is extremely important that the driller be drug free in the performance of his tasks in order to insure the immediate safety of the other personnel on the particular drill rig.

> 14. It is extremely important that the driller be drug free in the performance of his tasks in order to insure the safety and protection of the oil field itself and the oil resource contained within it.

■ Where the public policy supporting the Luedtkes privacy in off-duty activities conflicts with the public policy supporting the protection of the health and safety of other workers, and even the Luedtkes themselves, the health and safety concerns are paramount. As a result, Nabors is justified in determining whether the Luedtkes are possibly impaired on the job by drug usage off the job.

We observe, however, that the employer's prerogative does have limitations.

First, the drug test must be conducted at a time reasonably contemporaneous with the employee's work time. The employer's interest is in monitoring drug use that may directly affect employee performance. The employer's interest is not in the broader police function of discovering and controlling the use of illicit drugs in general society. In the context of this case, Nabors could have tested the Luedtkes immediately prior to their departure for the North Slope, or immediately upon their return

---

on an employment questionnaire. The court wrote:

> [I]f the questionnaire sought to obtain information in circumstances that constituted an "unreasonable, substantial or serious interference with [the employee's] privacy" in violation of the principles expressed in G.L.C. 214, § 1B, the discharge of an employee for failure to provide such information could contravene public policy and warrant the imposition of liability on the employer for the discharge. In short, if Bristol–Myers had no right to ask the questions that the plaintiffs declined to answer, Bristol–Myers could be liable for discharging the plaintiffs for their failure to answer those questions.

*Id.* 431 N.E.2d at 912 (footnote omitted). The court eventually held that the question asked, headed "AIMS," was not so intrusive as to result in a wrongful discharge. *Id.* at 913–14.

In *Slohoda v. United Parcel Service*, 193 N.J. Super. 586, 475 A.2d 618 (1984), a New Jersey court held that an employee discharged as a result of his marital status could maintain a cause of action against his employer for invasion of privacy in contravention of public policy.

**11.** Paul and Clarence also complain that the type of test used by Nabors, the "emit" test, is unreliable. We decline to address this issue for the following reasons: Paul does not contest the accuracy of the positive result in the test performed without his knowledge, and there is *no evidence* that the refusal by either Luedtke to submit to further testing was influenced by concern over the accuracy of Nabors' testing procedure.

**12.** *See, e.g., Mine Safety Appliances v. Stiles*, 756 P.2d 288 (Alaska 1988) (plaintiff suffered permanent, debilitating injury when metal cover fell on head); *Exxon Corp. v. Alvey*, 690 P.2d 733 (Alaska 1984) (plaintiff suffered substantial paralysis of legs and other injuries when he fell in hole at drilling site); *Parker Drilling Co. v. O'Neill*, 674 P.2d 770 (Alaska 1983) (employee killed when platform on which he was standing fell approximately twenty feet after platform was struck by "traveling block" weighing several tons); *Rig Tenders, Inc. v. Santa Fe Drilling Co.*, 536 P.2d 114 (Alaska 1975) (employee fell to his death when crane he was using to unload tender was pulled off drilling rig as a result of ice activity around the tender).

from the North Slope when the test could be reasonably certain of detecting drugs consumed there. Further, given Nabors' need to control the oil rig community, Nabors could have tested the Luedtkes at any time they were on the North Slope.

Second, an employee must receive notice of the adoption of a drug testing program. By requiring a test, an employer introduces an additional term of employment.[13] An employee should have notice of the additional term so that he may contest it, refuse to accept it and quit, seek to negotiate its conditions, or prepare for the test so that he will not fail it and thereby suffer sanctions.[14]

 These considerations do not apply with regard to the tests both Paul and Clarence refused to take. Paul was given notice of the future tests. He did not take the November 30 test. As a result, Nabors was justified in discharging Paul. Clarence had notice and the opportunity to schedule his test at a reasonable time. However, he refused to take any test. As a result, Nabors was justified in discharging Clarence. Neither discharge violated the implied covenant of good faith and fair dealing.

The question whether Paul's *suspension* breached the covenant of good faith and fair dealing is for the trier of fact. *See ARCO Alaska v. Akers*, 753 P.2d 1150, 1155 (Alaska 1988). On remand, the trial court should determine whether the covenant has been breached, taking additional evidence if necessary.

**D. Common Law Right to Privacy Claims.**

We recognize that "[t]he [common law] right to be free from harassment and con-

stant intrusion into one's daily affairs is enjoyed by all persons." *Siggelkow v. State*, 731 P.2d at 57 (Alaska 1987). As previously discussed, that law is delineated in the Restatement (Second) of Torts § 652B, entitled Intrusion upon Seclusion.[15] That section provides: "One who intentionally intrudes ... upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability ... if the intrusion would be highly offensive to a reasonable person."

 It is true, as the Luedtkes contend, that publication of the facts obtained is not necessary. Instead, the liability is for the offensive intrusion. *See Dietemann v. Time, Inc.*, 449 F.2d 245, 247–48 (9th Cir.1971). However, courts have construed "offensive intrusion" to require either an unreasonable manner of intrusion, or intrusion for an unwarranted purpose. *See Sistok v. Northwestern Tel. Sys., Inc.*, 189 Mont. 82, 615 P.2d 176, 182 (1980) (surreptitious recording of telephone conversations may be unreasonable); *Froelich v. Werbin*, 219 Kan. 461, 548 P.2d 482, 485 (1976) (hair sample taken from hospital trash not invasion of privacy); *Senogles v. Security Benefit Life Ins. Co.*, 217 Kan. 438, 536 P.2d 1358, 1362–63 (1975) (transmission of plaintiff's medical records to life insurance company justified); *McLain v. Boise Cascade Corp.*, 271 Or. 549, 533 P.2d 343, 345–46 (1975) (surveillance of workers' compensation claimant by filming his activities outside his home does not give rise to invasion of privacy claim). Paul has failed to show either that the manner or reason for testing his urine was unreasonable. During his physical, he voluntarily gave a urine sample for the purpose of testing. Therefore, he cannot complain that urine

---

13. Note that where the employment agreement is at-will, continuing to work after a modification of that agreement is sufficient consideration to support the modification. *See Yartzoff v. Democrat–Herald Pub. Co.*, 281 Or. 651, 576 P.2d 356, 359 (1978); 1A A. Corbin, *Corbin on Contracts* § 175, at 122 (1963). Thus there is no support for the argument that the Luedtkes' employment contracts could not be modified to provide for drug testing. The question before the court is whether those modifications are reasonable.

14. *See* Note, *Drug Testing of Public and Private Employees in Alaska,* 5 Alaska L.Rev. 133, 138–39 (1988) (author suggests Alaska decisions point to need for notice of possible grounds for termination).

15. There are four branches of the common law right to privacy. *See supra.* However, only the Intrusion upon Seclusion branch is contended by the Luedtkes to have been violated in this case.

testing is "highly offensive." *Compare Dietemann,* 449 F.2d at 246 (plaintiff did not know he was being filmed) *with Sistok,* 615 P.2d at 178 (recording of conversation was unknown to plaintiff). Paul can only complain about the purpose of the urine test, that is, to detect drug usage. However, we have held, *supra,* that Nabors was entitled to test its employees for drug usage. As a result, the intrusion was not unwarranted. Paul complains additionally that he was not aware his urine would be tested for drug usage. In this regard we observe that Paul was not aware of any of the tests being performed on his urine sample. Nor did he know the ramifications of those tests. But he did know that whatever the results were they would be reported to Nabors. Therefore, his complaint about a particular test is without merit. We conclude that for these reasons Paul could not maintain an action for invasion of privacy with regard to the urinalysis conducted October 19.

As to the urinalyses Paul and Clarence refused to take, we hold that no cause of action for invasion of privacy arises where the intrusion is prevented from taking place. *See Gretencord v. Ford Motor Co.,* 538 F.Supp. 331, 333 (D.Kan.1982) (no intrusion took place where employee refused to allow security guards to search vehicle.)

E. Attorney's Fees.

The Luedtkes' final arguments are that the trial court erred in awarding attorney's fees to Nabors in both cases. Clarence's brief contains a statement of this issue but no argument. It is therefore waived. *Wetzler v. Wetzler,* 570 P.2d 741, 742 n. 2 (Alaska 1977). Paul argues that the fees were excessive given the short, non-jury trial and the public nature of the questions presented.

Civil Rule 82 grants the trial court discretion in its attorney's fees award. Alaska R.Civ.P. 82. As we have previously noted, we will not reverse a fee award unless the trial court has abused its discretion to the extent that the award, is "manifestly unreasonable." *Steenmeyer Corp. v. Mortenson–Neal,* 731 P.2d 1221, 1226 (Alaska 1987) (quoting *Malvo v. J.C. Penney Co.,* 512 P.2d 575, 587 (Alaska 1973)). We do not find manifest unreasonableness in the award of $25,000 against Paul for a four-day trial based on uncertain legal theories. Nor do we find the public interest nature of the lawsuit to overcome Paul's private interest in regaining his employment. *See Southeast Alaska Conservation Council, Inc. v. State,* 665 P.2d 544, 553 (Alaska 1983).

In addition, Paul complains on appeal that the attorney's fees affidavit was not supported by an itemized statement of services rendered. Trial courts should base their awards on itemized statements. *See Moses v. McGarvey,* 614 P.2d 1363, 1374 n. 32 (Alaska 1980). However, we will not overturn a fee award for this reason when, as in Paul's case, no itemized statement was requested by the complaining party in its motion for reconsideration of the fee award.

## IV. CONCLUSION

For the reasons expressed above, the decision of the trial court in the case of *Paul M. Luedtke v. Nabors Alaska Drilling, Inc.* is AFFIRMED in part and REVERSED in part. The case is REMANDED to the trial court to determine whether Nabors breached the implied covenant of good faith and fair dealing in regard to Paul's suspension. The attorney's fee award must also be reconsidered by the trial court, consistent with this disposition.

For the reasons expressed above, the decision of the trial court in the case of *Clarence G. Luedtke v. Nabors Alaska Drilling, Inc.* is AFFIRMED.

MATTHEWS, C.J., concurs.

MATTHEWS, Chief Justice, concurring.

I agree with the majority's conclusion that Nabors was justified in discharging both appellants. Further I agree that on remand the trial court should determine whether Nabors breached the covenant of good faith and fair dealing by suspending Paul Luedtke because he tested positive for

using marijuana during a twenty-eight day leave period, without first notifying him that it was against company policy for employees to use marijuana at any time.

The critical element in Paul Luedtke's suspension claim is the alleged failure of Nabors to notify its employees that they were expected to refrain from using marijuana during their weeks on leave. It seems to me that a jury might find, if there was such a failure, that it amounted to conduct which was so unfair as to be a violation of the covenant of good faith and fair dealing. I do not, however, share the view that an employer may not impose as a condition of employment a requirement that its employees refrain from all use of marijuana at all times.[1]

In the private sector, the establishment of employment criteria has traditionally been left to employers, except as to such relatively narrow but important categories as race, religion, gender, and age. AS 18.80.220. So, if an employer wants to impose a condition of continued employment that none of its employees use marijuana at any time, I can see no legal impediment, apart from the possibility that advance notice of the condition may be required.

It may be that the covenant of good faith and fair dealing also requires that any employment criterion have some relationship to a legitimate employer concern. If a relationship is required, it would be easily met in the case of an employer whose policy it is to hire no one who used marijuana or other consciousness altering substances. Safety is a prime concern, as today's majority opinion makes clear. Those who use marijuana off duty are more likely to use or be influenced by marijuana on duty than those who do not use it at all. Moreover, considerations of lost productivity, absenteeism, and medical insurance rates may justify a total abstinence employment criterion. Drug use, including alcohol, has been estimated to cost employers between $60 billion and $100 billion per year.[2] Thus I believe that a private employer could, with proper notice, impose as a condition of employment a requirement that its employees not use marijuana at any time.

---

1. The following language in the majority's opinion implies that an employer may not impose a total abstinence requirement:

 As a result, Nabors is justified in determining whether the Luedtkes are possibly impaired on the job by drug usage off the job.

 We observe, however, that the employer's prerogative does have limitations.

 First, the drug test must be conducted at a time reasonably contemporaneous with the employees' work time. The employer's interest is in monitoring drug use that may directly affect employee performance. The employer's interest is not in the broader police function of discovering and controlling the use of illicit drugs in general society. In the context of this case, Nabors could have tested the Luedtkes immediately prior to their departure for the North Slope, or immediately upon their return from the North Slope when the test could be reasonably certain of detecting drugs consumed there.

2. Note, *Drug Testing of Public and Private Employees in Alaska,* 5 Alaska L.Rev. 133, 133 (1988). A recent survey puts the cost at more than $100 billion per year. N.Y. Times, Dec. 12, 1988 (Business Section), at 1, col. 1.